Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:11 PM CST

AMY MARSHALL, APPELLEE, V.
BRIAN W. MARSHALL, APPELLANT.
___ N.W.2d ___

Filed October 13, 2017.    No. S-15-035.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Divorce: Equity.** In Nebraska, dissolution of marriage cases are equitable in nature.

5. **Property Division.** The purpose of a property division is to distribute the marital assets equitably between the parties.

6. **____.** The ultimate test for determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. There is no mathematical formula by which property awards can be precisely determined.

7. **Property Division: Appeal and Error.** A division of property will not be disturbed on appeal unless it is patently unfair.

8. **Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and determine the marital liabilities

of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

9. ____. Any given property can constitute a mixture of marital and non-marital interests; a portion of an asset can be marital property while another portion can be separate property.

10. ____. As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule.

11. ____. Compensation for purely personal losses is not in any sense a product of marital efforts. Compensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate. On the other hand, compensation for past wages, medical expenses, and other items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by marital partnership.

12. **Property Division: Proof: Presumptions.** The burden of proving that all or a portion of an injury settlement is nonmarital rests on the spouse making the claim. If the burden is not met, the presumption remains that the proceeds from the settlement are marital property.

13. **Property Division.** The rule announced in *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999), does not require either that a settlement agreement itself must categorize the nature of the compensation or that parties must present expert testimony as to how settlement proceeds should be allocated. Rather, *Parde* simply requires competent evidence as to the nature of and underlying reasons for the compensation.

14. **Property Division: Proof.** Where the evidence shows the settlement proceeds were inadequate to compensate the purely personal losses proved by the injured spouse, and also were inadequate to compensate loses to the marital estate, inequity would generally result from classifying all of the settlement proceeds as either marital or nonmarital.

15. **Property Division.** The principles announced in *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999), can be applied to settlement proceeds that have already been spent, so long as the nonmarital portion of the settlement proceeds can be sufficiently traced.

16. ____. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.

17. **Property Division: Proof.** Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. But if the separate property remains segregated or is traceable into its product, commingling does

not occur. The burden of proof rests with the party claiming that property is nonmarital.

18. **Child Support: Rules of the Supreme Court.** The Nebraska Child Support Guidelines provide that in calculating the amount of child support to be paid, the court must consider the total monthly income, which is defined as income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages and includes income that could be acquired by the parties through reasonable efforts.

19. ____: ____. The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases.

20. **Child Support: Taxation: Equity: Rules of the Supreme Court.** Income for the purposes of calculating child support is not necessarily synonymous with taxable income. A flexible approach is taken in determining a person's income for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature.

Petition for further review from the Court of Appeals, MOORE, Chief Judge, and IRWIN and BISHOP, Judges, on appeal thereto from the District Court for Douglas County, THOMAS A. OTEPKA, Judge. Judgment of Court of Appeals reversed, and cause remanded with directions.

Donald A. Roberts and Justin A. Roberts, of Lustgarten & Roberts, P.C., L.L.O., for appellant.

Anthony W. Liakos, of Govier, Katskee, Suing & Maxell, P.C., L.L.O., for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

STACY, J.
Amy Marshall petitions for further review of the Nebraska Court of Appeals' opinion in *Marshall v. Marshall*.[1] She

---

[1] *Marshall v. Marshall*, 24 Neb. App. 254, 885 N.W.2d 742 (2016).

argues the Court of Appeals misapplied the principles of *Parde v. Parde*[2] when determining how proceeds from a personal injury settlement should be classified in this dissolution action. She also argues the appellate court erred in recalculating child support, reversing the property division, and reversing the award of alimony. On further review, we reverse the decision of the Court of Appeals and remand the cause with directions to affirm the decree entered by the trial court.

## I. FACTS

A complete recitation of the facts is set forth in the opinion of the Court of Appeals.[3] We summarize here only those facts which are relevant to the issues on further review.

Amy and Brian W. Marshall married in 1993. Amy filed a complaint for dissolution in February 2013, and trial was held in October 2014. By that time, one of the parties' two children had reached the age of majority, and the other was 18. Disputed issues at trial were child support, alimony, classification and division of assets and debts, and attorney fees.

### 1. Trial Evidence

Most of the evidence at trial focused on two issues: how to classify and allocate a personal injury settlement received during the marriage and how to calculate Brian's total monthly income for purposes of child support and alimony. Given the factually intensive nature of these issues, we recite in some detail the evidence on which the district court relied.

### (a) Personal Injury Settlement

In 2003, at age 34, Amy suffered a massive stroke. The stroke left her with permanent disabilities, including significant left-sided paralysis. Before the stroke, Amy had been taking the anti-inflammatory drug Vioxx on a regular basis. She did not have a prescription for Vioxx, but had been given free samples of the drug by a physician.

---

[2] *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999).

[3] *Marshall, supra* note 1.

Amy and Brian ultimately reached a settlement with Merck & Co., Inc. (Merck), the manufacturer of Vioxx. As part of the agreement, Amy and Brian executed a release of all claims. The release did not allocate the settlement proceeds to any particular claim or category of damages. The release contained a confidentiality provision limiting disclosure of the amount of the settlement payments; we thus will not reference the gross settlement amount in this opinion. It is sufficient to note that after deducting attorney fees and costs, Amy and Brian received net settlement proceeds totaling $330,621.14.

It is undisputed that the parties spent nearly all the settlement proceeds during their marriage. It is also undisputed that they were able to trace where most of the settlement proceeds were spent. As relevant to the issues on appeal, the evidence showed they used $84,268.83 to pay off the mortgage on the marital home and $90,123.36 to remodel the kitchen of that home. Another $5,211.90 was used for additional remodeling of the home. Brian put $20,000 into a new bank account in his name and used $33,333 to purchase a one-third interest in a business, "Elite Fitness."

### (i) Permanent Disability and
### Pain and Suffering

After the stroke, Amy was hospitalized for 1 week and then moved to a rehabilitation center for another 30 days. Once she was released to return home, Amy continued rehabilitation through physical therapy for approximately 4 years. Both Amy and her mother testified at trial about how the stroke affected her. The most complete explanation of Amy's condition and limitations after the stroke came from her rehabilitation physician:

> Despite a complete course of rehabilitation, [Amy] remains with rather significant left-sided paralysis. She has no significant functional use of the left upper extremity. She previously worked as an owner/operator of a hair salon. This stroke eliminated the functional use of her left

hand and ultimately she gave up her career and sold her salon. She has not been able to sustain reasonable work as a hairstylist since her stroke.

Functional tasks have become much more difficult . . . . [F]eeding is made more difficult as she is unable to cut her meat, prepare foods that require two hands and eating one-handed is simply clumsier and more difficult.

Likewise, dressing is performed entirely one-handed. She must select clothes from her wardrobe that do not have buttons or zippers. She also must perform toileting and bathing tasks one-handed and with adaptive equipment. These are performed more slowly and less thoroughly with her one-handed techniques. She is also unable to completely groom herself, particularly placing deodorant on her right side. She has difficulty grooming and bathing her right upper extremity with the paralyzed left arm.

[Amy] has the residuals of a neurogenic bladder post stroke. She has urinary urgency and must get to a bathroom more frequently than prior to her stroke. She is also more prone to the occasional bladder accident as a direct result of her stroke.

Exercise is performed more difficultly with her partially paralyzed left lower extremity. She is unable to ride a bicycle and is certainly unable to go jogging or ride an elliptical trainer. It is harder for her to achieve cardiovascular fitness under her hemiparetic circumstances.

Ambulation for [Amy] is clumsy and adaptive. She swings her left lower extremity forward in a circumferential pattern and has difficulty maintaining static stance on just her left lower extremity. She falls approximately once per month and has had [an] assortment of musculoskeletal bruises, sprains and strains as a result of her falls.

[Amy] requires lifelong treatment with an antiplatelet medication for her stroke. This slightly increases

her overall risk of cerebral hemorrhage and certainly increases the amount of bruising she suffers with normal everyday activities.

[Amy] at the present time [December 23, 2009,] is considered at maximum medical improvement in regard to her left hemiparetic stroke residuals. She has adapted her life to the near complete paralysis of her left upper extremity and the partial paralysis of her left lower extremity. Nonetheless, she has suffered significant functional impairments in her activities of daily living as a direct result of her stroke sequelae.

### (ii) Past and Future
### Lost Earnings

Before the stroke, Amy co-owned a hair salon and earned approximately $43,580 per year. After the stroke, Amy was not able to work at all for several years, so she sold her interest in the hair salon. Later, she used proceeds from the sale of her salon to remodel a portion of the basement of the parties' home into a hair salon. She eventually returned to work as a hairstylist, working about 3 hours a day, 2 to 3 days a week. She has 10 loyal clients, mostly family and friends, who are willing to assist her with styling. In 2013, the gross income from Amy's home salon was $6,375 and her expenses were $7,000. Amy's past lost earnings from the time of her stroke until the parties' separation exceeded the amount of the Merck settlement proceeds. Her future lost earnings were estimated at over $1,133,000.

### (b) Child Support

For purposes of calculating child support, the parties agreed on the amount of Amy's total monthly income, but disagreed regarding the amount of Brian's total monthly income. The evidence showed Brian had several sources of income, as well as in-kind benefits.

Brian works as the property manager for Marshall Enterprises, doing general property maintenance and upkeep.

He owns 49 percent of Marshall Enterprises, and his mother owns the remaining 51 percent. Marshall Enterprises manages properties purchased by Brian's parents and held in trust. Brian testified that he receives a salary of $2,500 per month, but his 2013 tax returns did not show any income from wages or salary. In addition, Marshall Enterprises provides Brian a truck, pays for maintenance and insurance on the truck, pays his cell phone bill of approximately $270 per month, allows Brian to live rent free in one of its rental properties that rents for $1,000 per month, and provides health insurance for Brian and his family.

Brian also operates a snow removal business. He testified he usually earns "$10,000 or more" annually from his snow removal business. Brian's income tax returns for 2009 through 2013 reported net profits for this business of $11,184, $10,830, $15,958, $12,990, and $13,805, respectively. Also, Brian's bank account statements from January to August 2014 showed average monthly deposits of more than $7,400—well in excess of what he claimed to be earning from his property management and snow removal jobs—and he provided conflicting testimony regarding the source of those regular deposits. Brian denied having investment income, but his tax return reported capital gains from the sale of stock acquired during the marriage.

At trial, Amy argued the evidence showed Brian's total monthly income was $11,041.25. Brian argued the evidence showed his total monthly income was $3,600. Generally, the disparity reflected the parties' differing valuations of Brian's in-kind benefits and their differing positions about the source of the regular deposits into his bank account.

## 2. DISSOLUTION DECREE

The district court entered a 34-page decree, with 17 pages of factual findings. We address only those portions of the decree that are relevant to consideration of the issues on further review.

### (a) Merck Settlement Proceeds

The district court's decree acknowledged the parties' primary disagreement over what portion, if any, of the Merck settlement proceeds were properly characterized as nonmarital. It then recited and applied the principles announced in *Parde v. Parde*.[4] In that case, we held that settlement proceeds compensating a spouse for "purely personal losses" such as pain, suffering, disfigurement, disability, and postdivorce loss of earning capacity are not part of the marital estate, but that settlement proceeds for past wages, past medical expenses, and other items that compensate for diminution of the marital estate should be included in the marital estate.[5] Under *Parde*, the burden of proving that all or a portion of the settlement is nonmarital rests on the spouse making the claim; if the burden is not met, the settlement proceeds are presumed to be marital property.[6]

The district court noted that, like the settlement at issue in *Parde*, the Merck settlement "was silent on allocation" of the settlement proceeds. But the court went on to find:

> Notwithstanding [the failure to allocate], the Court, as the trier of fact and judge of the credibility of the witnesses, had an opportunity, over two days of trial, to not only see and hear Amy testify but [to] see how profoundly and permanently she has been affected and disabled by the massive stroke she sustained at such an early age [and] Brian . . . is now seeking to receive credit for half of the personal injury settlement of $330,621.14. The Court did not need the settlement documents . . . to see and appreciate the serious nature of Amy's permanent injuries. The settlement does not come close to compensating Amy for her future pain, suffering, disfigurement, [and] disability.

---

[4] *Parde, supra* note 2.

[5] *Id.* at 109, 602 N.W.2d at 663.

[6] *Parde, supra* note 2.

The district court did not make an express finding allocating a certain percentage of the settlement proceeds as either marital or nonmarital. Instead, after making factual findings tracing the Merck settlement proceeds to several marital assets, the court divided those assets between the parties and, in valuing the assets, awarded a credit for nonmarital funds invested in that asset. Specifically, the court found that $179,604 of the Merck settlement proceeds had been used to pay off the mortgage and remodel the marital home. The court then awarded Amy the marital home, valued at $348,600, and gave her a credit of $179,604 against the value of the property to reflect her nonmarital share of the settlement proceeds.

The court took a similar approach with Brian. It found that he opened a bank account with $20,000 from the personal injury settlement and, by the time of trial, had spent the account down to $600. The court awarded Brian the account "as credit against his derivative or marital claim to the settlement proceeds." The court also found that Brian used $37,333.33 of the personal injury settlement to purchase an interest in Elite Fitness. The court awarded that business investment to Brian "as a credit against his derivative or marital claim to the settlement proceeds."

### (b) Division of Marital
### Assets and Debts

Ultimately, the court calculated and divided the marital estate such that Amy received the marital home and her personal vehicle; Brian received a rental home, two trucks and two boats, his interest in Elite Fitness, and his 49-percent interest in Marshall Enterprises. The parties were each awarded the bank accounts in their own names, and the joint accounts were divided equally. The court also divided equally the cash value of various life insurance policies held by Brian. No equalization payment was ordered.

### (c) Child Support

The court's decree noted the significant disparity in the parties' proposed child support calculations and described the

evidence regarding Brian's income as "confounding and at times conflicting." Nearly two pages of the court's factual findings were devoted to reciting what the court described as a "few, but certainly not all, examples" of Brian's contradictory evidence regarding his income and investments.

Ultimately, the court arrived at Brian's total monthly income by splitting the difference between the parties' suggested income calculations for Brian and adjusting the figure downward by several hundred dollars. The court explained that its decision to split the difference was based on the conflicting nature of the evidence, the best interests of the child and her age (18), and the equities of the situation. Using a total monthly income figure for Brian of $7,000, Brian was ordered to pay $935 per month in child support.

### (d) Alimony

After reciting and analyzing the factors set out in Neb. Rev. Stat. § 42-365 (Reissue 2016), the district court ordered Brian to pay Amy alimony of $2,000 per month for a period of 21 years.

### 3. Court of Appeals' Decision

Brian appealed the decree. As relevant to this appeal, he assigned error to the district court's (1) classification and division of the marital estate, including classifying any portion of the settlement proceeds as nonmarital; (2) calculation of Brian's income for child support purposes; and (3) award of alimony. In a split decision, the Court of Appeals affirmed in part, and in part reversed and remanded with directions.

### (a) Settlement Proceeds

The Court of Appeals found that Amy "failed to sufficiently demonstrate that any portion of the settlement proceeds were nonmarital property."[7] It reasoned:

> While it is clear that Amy's stroke has left her with serious physical impairments, it is also clear that her

---

[7] *Marshall, supra* note 1, 24 Neb. App. at 258-59, 885 N.W.2d at 747.

stroke resulted in a great reduction in the value of the marital estate. The settlement proceeds received from Merck were simply not enough to cover all of the damages incurred by the parties. And, Amy simply failed to prove that any portion of the settlement proceeds were specifically allocated to her purely personal losses. In particular, Amy did not present any evidence which showed that 54 percent of the settlement proceeds were her nonmarital property. Thus, it is not clear how the district court determined that the proceeds should be broken down such that Amy received 54 percent of the proceeds as her nonmarital property; Brian received 12.5 percent of the proceeds as his nonmarital property; and the remaining 33.5 percent of the proceeds stayed in the marital estate. Without specific proof about how the settlement proceeds should be broken down, the presumption remains that all of the proceeds from the personal injury settlement are marital property. The district court erred in arbitrarily setting aside any portion of the settlement proceeds as nonmarital property. The entirety of the proceeds should be included in the marital estate.[8]

In reaching this conclusion, the Court of Appeals emphasized that the settlement proceeds were inadequate to compensate the marital estate for the income Amy lost after her stroke and before the parties separated. It reasoned:

Evidence presented at trial revealed that prior to Amy's stroke, she worked full time as a hairdresser . . . . Her annual wages for this employment totaled approximately $43,580. After Amy's stroke, she is essentially unable to work as a hairdresser. She now earns a negligible amount of money working only a few hours a week. Accordingly, it is clear that the marital estate was greatly diminished as a result of Amy's lost wages. In fact, Amy's lost wages from the time of her stroke in 2003 through the

---

[8] *Id.* at 263-64, 885 N.W.2d at 750.

times of the parties' separation 10 years later in 2013 totaled more than $100,000 over the entirety of the settlement proceeds.[9]

Because it reversed the district court's decision to exclude portions of the personal injury settlement from the marital estate, the Court of Appeals remanded the matter to the district court to recalculate the value of the marital estate and to reconsider the equitable division of the marital assets.

### (b) Child Support

The Court of Appeals found the district court erred in using $7,000 as Brian's monthly income for purposes of calculating child support. It found that Amy's proposed monthly income figure for Brian was not supported by the record and therefore concluded it was not reasonable for the district court to "'split the difference'" between Amy's and Brian's proposed figures when determining Brian's monthly income.[10] The Court of Appeals recalculated Brian's monthly income based on its de novo review of the evidence, and it found his monthly income was $5,864.20, which it rounded up to $6,000. It then directed the district court, on remand, to recalculate child support using $6,000 as Brian's monthly income figure.

### (c) Alimony

The Court of Appeals found no abuse of discretion in ordering Brian to pay alimony of $2,000 per month for 21 years. However, because it was remanding the matter to the district court to recalculate and divide the marital estate and to recalculate Brian's child support, it reversed the alimony award as well, recognizing that when the district court performed these recalculations, its determination regarding appropriate alimony may be affected. As such, the Court of Appeals directed the district court on remand to "reconsider the issue of alimony in light of the changed circumstances resulting from

---

[9] *Id.* at 263, 885 N.W.2d at 750.

[10] *Id.* at 267, 885 N.W.2d at 752.

the recalculation of both the marital estate and Brian's current income."[11]

### 4. MATTERS BEFORE COURT
### ON FURTHER REVIEW

Both parties have assigned error on further review, but only Amy's assignments are properly before us. Neb. Ct. R. App. P. § 2-102(F)(1) (rev. 2015) requires that a petition for further review and memorandum brief "must be filed within 30 days after the release of the opinion of the Court of Appeals or the entry of the order of the Court of Appeals finally disposing of the appeal, whichever occurs later."

The Court of Appeals' opinion was released August 16, 2016. Amy timely filed for further review within 30 days of that date, and we granted her petition. Brian, however, did not petition for further review within 30 days of August 16. Instead, after Amy's petition was granted, he filed a brief opposing the assignments Amy raised on further review and purporting to cross-petition for further review to assign errors of his own. This purported cross-petition was out of time. As such, further review will be limited to the assignments raised by Amy.

## II. ASSIGNMENTS OF ERROR

Amy assigns the Court of Appeals erred in (1) determining that the entirety of the settlement proceeds should be included in the marital estate, (2) remanding the matter to the district court for recalculation of the value of the marital estate and redistribution of the assets and debts, (3) reversing the district court's award of alimony, and (4) remanding the matter for recalculation of Brian's child support obligation.

## III. STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's

---

[11] *Id.* at 273-74, 885 N.W.2d at 756.

determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.[12]

[2] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[13]

[3] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[14]

## IV. ANALYSIS

### 1. Classification of Settlement Proceeds

The primary issue in this appeal is whether the trial court erred in classifying $179,604 of the settlement proceeds as Amy's nonmarital property and dividing the parties' assets based on that classification. Before directly addressing that issue, we set out the general principles that guide our analysis.

[4-7] In Nebraska, dissolution of marriage cases are equitable in nature.[15] The purpose of a property division is to distribute the marital assets equitably between the parties.[16] The ultimate test for determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.[17] There is no mathematical formula by which property awards can be precisely determined.[18] A

---

[12] *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[13] *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017).

[14] *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017).

[15] *Laschanzky v. Laschanzky*, 246 Neb. 705, 523 N.W.2d 29 (1994).

[16] § 42-365.

[17] *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000).

[18] See *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995).

division of property will not be disturbed on appeal unless it is patently unfair.[19] As we stated in *Parde v. Parde*,[20] "In equity, there is rarely one tidy answer that fits every size and type of problem that courts are called upon to resolve."

[8,9] Under § 42-365, the equitable division of property is a three-step process.[21] The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and determine the marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.[22] We have recognized that any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.[23]

[10] As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule.[24] In the instant case, Amy relies on the exception for that portion of personal injury settlement proceeds which compensate a spouse for his or her "purely personal losses."[25]

Amy argues the trial court did not abuse its discretion in classifying and allocating the personal injury settlement proceeds, and she claims the Court of Appeals erred in finding there was a failure of proof. We agree, and begin our analysis with a discussion of the seminal case, *Parde v. Parde*.

In *Parde*, the husband was injured on the job during the marriage and ultimately received a settlement from his

---

[19] See *Heser v. Heser*, 231 Neb. 928, 438 N.W.2d 795 (1989).

[20] *Parde, supra* note 2, 258 Neb. at 108, 602 N.W.2d at 662.

[21] *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017); *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015).

[22] *Id.*

[23] *Stephens, supra* note 21.

[24] *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

[25] See *Parde, supra* note 2, 258 Neb. at 109, 602 N.W.2d at 663.

employer. Part of the settlement provided a cash payment, and part required the employer to fund an annuity which had not yet come due when the parties divorced. By that time, the cash portion of the settlement had been spent and was reflected in the assets of the parties; those assets were divided pursuant to the parties' settlement agreement. But a primary issue during the dissolution proceedings was whether the future annuity should be included or excluded from the marital estate. The district court found the annuity should be classified as marital property, and the husband appealed. The Court of Appeals reversed, finding the trial court had abused its discretion in failing to exclude the annuity as nonmarital property. We granted further review to clarify what we characterized as an "unnecessarily . . . muddled area of the law—determining which portions of an injured spouse's personal injury settlement should be included in the marital estate for purposes of property division.[26]

[11,12] We observed there are two general approaches to the issue: the mechanical approach and the analytic approach. Under the mechanical approach, applied by a minority of jurisdictions, personal injury awards are treated entirely as marital property. Under the analytic approach, courts analyze the nature and underlying reasons for the compensation, and classify it accordingly. We found the analytic approach to be more consistent with the basic rule that the marital estate should include only property created by the marital partnership, and we adopted that approach. We explained:

> Compensation for purely personal losses is not in any sense a product of marital efforts. We, therefore, hold that compensation for an injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or loss of postdivorce earning capacity should not equitably be included in the marital estate. On the other hand, compensation for past wages, medical expenses, and other

---

[26] *Id.* at 106, 602 N.W.2d at 661.

items that compensate for the diminution of the marital estate should equitably be included in the marital estate as they properly replace losses of property created by marital partnership.[27]

*Parde* emphasized that the burden of proving that all or a portion of the settlement is nonmarital rests on the spouse making the claim.[28] If the burden is not met, the presumption remains that the proceeds from the settlement are marital property.

In *Parde*, we applied the analytic approach and concluded that the cash portion of the settlement, which had been spent and was reflected in the parties' assets, more than adequately compensated the marital estate for any wages the husband lost during the marriage. We further held that the district court abused its discretion in classifying the annuity as marital. We rejected the wife's argument that the husband had failed to meet his burden of proof because he had not offered "direct evidence" establishing that the annuity "carried a specific designation showing it was for a nonmarital purpose."[29] We explained:

> While the husband's evidence did not consist of a settlement document with a tidy breakdown of each dollar of the settlement into well-defined categories, the testimony . . . when considered with the language of the Release itself and the settlement as a whole, proved what portion of the entire settlement is to be reasonably considered as lost wages during the marriage and, thus, as a marital asset. By proving what portion of the entire settlement should be considered as a marital asset, the husband has necessarily proved what portion could properly be viewed as nonmarital property.[30]

---

[27] *Id.* at 109-10, 602 N.W.2d at 663.

[28] See *id.*

[29] *Id.* at 112, 602 N.W.2d at 664-65.

[30] *Id.* at 112-13, 602 N.W.2d at 665.

Here, the parties do not dispute that the personal injury settlement with Merck represents compensation for any and all damages sustained by Amy, Brian, and the marital estate as a result of Amy's stroke. But applying the principles announced in *Parde* to the instant appeal is complicated by two things: (1) the fact that the evidence shows the settlement proceeds were insufficient to compensate either Amy or the marital estate for the losses proved at trial and (2) the fact that the settlement proceeds have largely been spent. Although *Parde* did not directly address these complicating factors, we find nothing in the approach taken by the district court that was inconsistent with the general principles articulated in *Parde*.

The district court recognized that Amy had the burden, as the one claiming some or all of the settlement proceeds were nonmarital, to present evidence showing that all or a portion of the proceeds were specifically allocated to her purely personal losses.[31] The first issue, therefore, is whether she presented evidence sufficient to meet this burden of proof.

The Court of Appeals held that Amy "simply failed to prove that any portion of the settlement proceeds were specifically allocated to her purely personal losses."[32] Our de novo review of the record leads us to a different conclusion. Amy presented her own testimony, testimony from her mother, evidence from her treating physician as to the nature and extent of her physical injuries, and evidence of future lost earnings. The trial court found this evidence credible and made an express finding that the settlement proceeds did "not come close to compensating Amy" for her purely personal losses. All of this evidence demonstrated that Amy has sustained a significant amount of uniquely personal loss and implicitly demonstrated that a significant portion of the settlement proceeds was necessarily allocated to compensate her for this loss.

---

[31] See *id*.

[32] *Marshall, supra* note 1, 24 Neb. App. at 263, 885 N.W.2d at 750.

[13] We take this opportunity to clarify that the rule announced in *Parde* does not require either that the settlement agreement itself must categorize the nature of the compensation or that parties must present expert testimony as to how settlement proceeds should be allocated. Rather, *Parde* simply requires competent evidence as to the nature of and underlying reasons for the compensation. It is not at all uncommon for personal injury settlement agreements to be silent regarding allocation, and we soundly reject any suggestion that such silence compels the conclusion that the entire settlement must be classified as marital property.

We also reject any suggestion that the analytic approach adopted in *Parde* requires testimony or evidence of a particular mathematical breakdown of the settlement proceeds. District court judges are well acquainted with personal injury evidence and damages and are called upon regularly to determine and allocate such damages. Indeed, case law from other jurisdictions indicates that neither mathematical allocation of settlement proceeds nor expert testimony as to allocation is required and that trial courts instead allocate damages based on personal testimony and other evidence.[33] As the Supreme Court of Alaska has stated:

> Although mathematically exact allocation of [a personal injury] award may not be possible, we are confident of the ability of the trial court to make a reasonable apportionment. Like the Supreme Court of New Jersey, "[w]e do not expect that the allocation of such awards will present any serious problems. Trial courts are used to allocating and tracing assets in equitable distribution cases."[34]

---

[33] See, *Tramel v. Tramel*, 740 So. 2d 286 (Miss. 1999); *Dalessio v. Dalessio*, 409 Mass. 821, 570 N.E.2d 139 (1991); *Bandow v. Bandow*, 794 P.2d 1346 (Alaska 1990).

[34] *Bandow, supra* note 33, 794 P.2d at 1350, quoting *Landwehr v. Landwehr*, 111 N.J. 491, 545 A.2d 738 (1988).

[14] We acknowledge, as did both the lower court and the Court of Appeals, that the total amount of compensation here was inadequate to fully compensate either Amy or the marital estate for the full extent of losses suffered. That does not mean, however, that either all or none of the settlement proceeds must be classified as nonmarital. Indeed, where, as here, the evidence shows the settlement proceeds were inadequate to compensate the purely personal losses proved by the injured spouse, and also were inadequate to compensate loses to the marital estate, inequity would generally result from classifying all of the settlement proceeds as either marital or nonmarital.

We have recognized that any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.[35] As our recitation of the facts demonstrates, there was substantial evidence presented to the district court that the stroke caused Amy significant personal pain, suffering, disfigurement, disability, and loss of postdivorce earning capacity. While the marital estate also suffered significant loss due to Amy's lost wages, we cannot find that the district court abused its discretion in classifying slightly more than one-half of the settlement proceeds as Amy's nonmarital property.

[15-17] This case also demonstrates that the principles announced in *Parde* can be applied to settlement proceeds that have already been spent, so long as the nonmarital portion of the settlement proceeds can be sufficiently traced. We have recognized that setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.[36] Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of

---

[35] *Stephens, supra* note 21.

[36] *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

the other spouse.[37] But if the separate property remains segregated or is traceable into its product, commingling does not occur.[38] The burden of proof rests with the party claiming that property is nonmarital.[39]

Here, that burden was met. The evidence was undisputed that $179,604 of the settlement proceeds was used to pay off the mortgage and remodel the marital home. After tracing that portion of the settlement proceeds to the marital home, the district court awarded Amy the marital home, valued at $348,600, and gave her a credit of $179,604 against the value of the property to reflect her nonmarital share of the settlement proceeds. This approach was equitable, consistent with the principles articulated in *Parde*, and supported by the evidence.

For all of these reasons, we find the trial court did not abuse its discretion in classifying and allocating Amy's nonmarital share of the settlement proceeds in the context of dividing the marital estate. To the extent the Court of Appeals concluded otherwise, we reverse.

## 2. CHILD SUPPORT

The Court of Appeals found the district court abused its discretion in determining Brian's total monthly income was $7,000 for purposes of the child support calculation. Based on its de novo review of the evidence, the Court of Appeals determined Brian's total monthly income was $6,000 and remanded the matter to the district court with instructions to recalculate child support using the lower monthly income figure. On further review, we find no abuse of discretion in the district court's calculation of Brian's monthly income.

[18] The Nebraska Child Support Guidelines provide that in calculating the amount of child support to be paid, the court

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

must consider the total monthly income, which is defined as "income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages" and includes income that could be acquired by the parties through reasonable efforts.[40]

[19,20] We have not set forth a rigid definition of what constitutes income, but instead we have relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases.[41] Thus, income for the purposes of calculating child support is not necessarily synonymous with taxable income.[42] We take this flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature.[43] Thus, a court is allowed, for example, to add "in-kind" benefits, derived from an employer or other third party, to a party's income.[44]

The decree described the evidence of Brian's income as "confounding and at times conflicting." Our de novo review of the record supports that characterization. The evidence adduced at trial could conceivably support a variety of reasonable monthly income calculations, but the trial court ultimately decided: "Based upon the evidence and the conflicting nature of same, [the minor's] age, her best interests, the equities of the situation and the need to later address alimony, the Court . . . split[s] the difference between the [parties'] suggested monthly gross incomes for Brian . . . and adjust[s] that difference downward slightly . . . ."

---

[40] Neb. Ct. R. § 4-204 (rev. 2016).

[41] *Gangwish, supra* note 24; *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001).

[42] *Gangwish, supra* note 24.

[43] *Id.*

[44] *Workman, supra* note 41.

While we do not generally endorse the practice of splitting the difference in making child support calculations, we acknowledge the practice of splitting the difference is used occasionally by trial courts, sitting in equity, when there is a conflict in the evidence.[45] But regardless of the rationale utilized by the trial court, our de novo review of the record does not show an abuse of discretion in using a figure of $7,000 as Brian's monthly income.

The Court of Appeals engaged in an exhaustive de novo review of the record and determined it supported a finding that Brian's monthly income was $6,000. In doing so, however, it relied extensively on Brian's testimony and evidence produced by Brian with respect to his monthly income. Although our review is de novo, we cannot discount that the trial judge, who was in the best position to observe the witnesses' demeanor and credibility, expressed significant concern about Brian's credibility and the contradictory nature of the evidence Brian presented. When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[46] In light of the conflicting nature of the evidence, the trial court's concerns about Brian's credibility, and particularly because the minor child was 18 at the time of trial and the support order was to last only a matter of months, we cannot find the trial court abused its discretion in finding that Brian's total monthly income for child support purposes was $7,000. We therefore reverse the Court of Appeals' decision on this issue.

### 3. Alimony

Finally, although the Court of Appeals found no abuse of discretion in the district court's alimony award, it reversed the award, because it was remanding the matter for recalculation

---

[45] See, *Shald v. Shald*, 216 Neb. 897, 346 N.W.2d 406 (1984); *Sneckenberg v. Sneckenberg*, 9 Neb. App. 609, 616 N.W.2d 68 (2000).

[46] *Erin W., supra* note 14.

and division of the marital estate and for recalculation of child support and wanted the trial court to have an opportunity to reconsider the issue of alimony as well. Because we conclude on further review that the district court's decree should be affirmed, there is no need to reconsider alimony, and this aspect of the Court of Appeals' opinion is reversed as moot.

## V. CONCLUSION

For the foregoing reasons, we find no abuse of discretion in the trial court's classification and allocation of the personal injury award or in the trial court's determination of Brian's monthly income for purposes of calculating child support. We therefore reverse the Court of Appeals' decision and remand the matter with directions to affirm the decree of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.