IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


CALLAHAN V. GALAWAY


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


COURTNEY L. CALLAHAN, APPELLEE,

V.

SPENCER W. GALAWAY, APPELLANT.


Filed April 26, 2022.    No. A-21-629.


Appeal from the District Court for Buffalo County: RYAN C. CARSON, Judge. Affirmed.

Shane M. Cochran, of Cochran Law, P.C., L.L.O., for appellant.

Sean M. Reagan, of Reagan, Melton & Delaney, L.L.P., for appellee.


MOORE, RIEDMANN, and ARTERBURN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Spencer W. Galaway appeals the order of the district court for Buffalo County establishing his paternity of the child he shares with Courtney L. Callahan, awarding custody and parenting time, and ordering child support. Finding no abuse of discretion in the district court's decisions, we affirm.

## BACKGROUND

Galaway and Callahan are the parents of a minor child born in December 2019. In May 2020, Callahan filed a complaint to establish Galaway's paternity of the child and asked the court to award her legal and physical custody of the child, subject to Galaway's parenting time, and child support. In a temporary order entered in June 2020, the district court awarded the parties joint legal custody but granted physical custody to Callahan and parenting time to Galaway every other

- 1 -

weekend from Friday evening until Sunday evening and every Wednesday evening from 5:30 until 7:30. Galaway was also ordered to pay temporary child support of $491 per month.

Trial on the issues of custody, parenting time, and child support occurred in May 2021. The evidence established that Galaway and Callahan met in October 2018. Galaway moved in with Callahan in her mother's house shortly before the child was born. After the birth, Callahan took 12 weeks off of work for maternity leave, and Galaway took off the month of December. The parties agreed that during that time, Galaway assisted with changing the child's diapers and giving her baths, but Callahan testified that she handled the majority of the parenting duties and that she had been the child's primary caregiver since her birth. Once Galaway returned to work in January 2020, he commuted approximately 90 minutes from Callahan's home in Kearney to his job in York. During that time, he also assisted in caring for Callahan's older daughter, who was 8 years old at the time of trial, including taking her to school in the mornings. The parties tried to make their relationship work, but once they ended it in May 2020, Galway moved back to York while Callahan remained in Kearney.

As the district court recognized in its order, the parties each acknowledged that there were impediments to their relationship. Galaway fathered a child with another woman, and that child was born in January 2020, approximately one month after the child he shares with Callahan was born. Similarly, Callahan was involved with another man while she and Galaway were together, and at the time of trial, she was in a relationship with that man. Despite these impediments, the parties each testified that they have been able to communicate and work together for the sake of their child. To this end, during the pendency of the case, they agreed to modify the court's temporary order such that Galaway had parenting time with the child every other Wednesday evening through Sunday evening, and they agreed that that arrangement was working well.

At the time of trial, Callahan was working as a receptionist at a medical facility, Monday through Friday from 8 a.m. until 5 p.m., earning $14.32 per hour. She owns a three bedroom home in Kearney and lives with her current boyfriend and the minor child at issue here. She also shares custody of her older child with the child's father, who lives 4 blocks from her. She testified that her boyfriend and the minor child get along well and that the minor child and her older daughter are "best friends." Callahan testified that the minor child follows her older daughter everywhere she goes, and that the girls play together, take baths together, and are inseparable. They even converted one bedroom at her house to a playroom because her older daughter wanted to share a bedroom with the minor child.

Callahan was not opposed to Galaway having the minor child every other week in the summertime, but she was concerned about when the child begins kindergarten. The parties agreed that joint physical custody would not be feasible at that time because of the distance between them. Callahan was asked why she opposed a week on, week off arrangement currently, and she explained that she has observed her older daughter struggle with dividing time between her father and Callahan, testifying that "it's emotional" and that she feels like her older daughter "doesn't have a home" because she is switching back and forth so frequently. Therefore, she wanted the child she shares with Galaway to feel like she has a place to call home.

At the time of trial, Galaway was living and working in York. He works as a mechanic and shop manager at a transportation company earning $24 per hour. He generally works Monday through Friday, 8 a.m. until 5 p.m., but his hours are flexible so he can take time off and make it

up at another time if necessary. He also participates in stock car racing, and during racing season, which occurs in the summer months, he races on Thursday and Saturday nights. The races are family friendly, however, with other children present, and his mother testified that they purchased ear muffs for the minor child so she can attend the races with Galaway's family.

Galaway was living in a five bedroom house he purchased in late April 2020. He lives with his younger child and the child's mother, but they each testified that they are not romantically involved and have separate bedrooms. He also has a roommate who lives in the basement of the home. His younger child's mother helps provide child care for the minor child when Galaway is working because her work schedule does not frequently overlap with Galaway's. Even though they live together, Galaway pays her $255 per month pursuant to a temporary child support order. Galaway requested joint physical custody of the minor child with a week on, week off schedule until the child begins kindergarten. At that time, he would like primary physical custody so the minor child and his younger child would be able to attend school together.

Galaway's tax returns from 2017, 2018, and 2019 were received into evidence at trial. For each of those years, he earned income beyond his full-time employment from side jobs such as harvesting, auto repair, and snow removal. He acknowledged that he did not claim some of his additional earnings, such as those from auto repair, on his tax returns because it was not a significant amount of money. He also acknowledged that he receives sponsorships from racing, but testified that he does not earn an income on racing and instead the sponsors cover certain costs like new tires on his car, fuel, or race admission fees. He was asked whether he claimed any of the sponsorships, either money or products, as income on his tax returns, and he responded that he had not but that he was going to do so for the first time this year. He also explained that he typically uses his vacation time from work to do some of his side jobs, but now that he has children, he is not going to do the side jobs as often in order to spend time with his children and use his vacation time to travel with his children.

The district court entered a written order after trial establishing Galaway's paternity of the minor child. The court found that both parties were fit parents who care about their child and provide for her safety and well-being. Thus, the parties were awarded joint legal custody. The court explained that while it carefully considered Galway's request for joint physical custody, it recognized the parties' acknowledgment that this arrangement would not be feasible once the child reaches school-age given the distance between Kearney and York. The court noted that the evidence showed that Galaway had been actively involved in the child's life and that he cares for his daughter very much, but that Callahan had been the primary caretaker of the child since her birth. Thus, the district court awarded primary physical custody to Callahan, finding that she was best able, "however slight," to continue to provide for the child's emotional growth and well-being. The court also reasoned that this arrangement was in the best interests of the child given her age, the importance of fostering a relationship between the child and parents, and the need to maintain stability for the child.

Galaway was awarded parenting time every other weekend from Thursday evening until Sunday evening until the child begins kindergarten. At that time, Galaway is to have parenting time every other weekend from Friday evening until Sunday evening with the option to extend his parenting time if there is no school on Friday or the following Monday. For the summer, the court

awarded the parties week on, week off parenting time. Holidays were also divided between the parties.

With respect to child support, the district court found that Galaway earns $24 per hour or a gross monthly income of $4,160 from his full-time employment. It recognized that he is ordered to pay $255 per month in child support for his other child. The court noted Galaway's testimony that he works a variety of other jobs during the year, including auto repair and snow removal, and noted that his tax returns reflect gross income of $52,939 in 2019; $54,422 in 2018; and $47,167 in 2017. Thus, the court found it appropriate to utilize the average of these incomes to arrive at a gross annual income of $51,509 or a gross monthly income of $4,292. As a result, Galaway was ordered to pay $542 per month in child support with a 50 percent abatement for June, July, and August due to having joint custody during those months.

Galaway subsequently filed a motion for new trial or motion to alter or amend. The court granted the motion in part, modifying the parenting plan to provide Galaway with parenting time every other weekend from *Wednesday* evening through Sunday evening, consistent with the parties' agreed modification of the temporary order during the proceedings. His motions were otherwise overruled. Galaway timely appeals.

ASSIGNMENTS OF ERROR

Galaway assigns that the district court erred in (1) failing to award the parties joint physical custody of the child until she reaches kindergarten age, (2) failing to award primary physical custody to him once the child reaches kindergarten age, and (3) its determination of child support by failing to use a joint custody worksheet and its calculation of his income.

STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *Tyler F. v. Sara P.*, 306 Neb. 397, 945 N.W.2d 502 (2020).

While a paternity action is one at law, the award of child support in such an action is equitable in nature. *State on behalf of Andrew D. v. Bryan B.*, 22 Neb. App. 914, 864 N.W.2d 249 (2015). A trial court's award of child support in a paternity case will not be disturbed on appeal in the absence of an abuse of discretion by the trial court. *Id*.

ANALYSIS

*Physical Custody.*

In his first two assignments of error, Galaway challenges the district court's decision awarding primary physical custody of the child to Callahan, both now and once the child reaches kindergarten age. He asserts that the court should have awarded joint physical custody now and that he should have received primary physical custody once the child begins kindergarten. We find no abuse of discretion in the district court's decisions.

The Parenting Act, Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2016 & Cum. Supp. 2020), requires that all custody and parenting time arrangements be determined based on the best interests of the child. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692

(2019); § 43-2923(6). When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *State on behalf of Kaaden S. v. Jeffery T., supra*; § 43-2923(6). The Parenting Act also provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. *State on behalf of Kaaden S. v. Jeffery T., supra*; § 43-2923(3).

In addition to considering these statutory factors, our case law instructs that when making determinations as to the allocation of parenting time that is in a child's best interests, a trial court should also consider the parties' ability to communicate on issues such as transportation, homework, discipline, medical and dental appointments, and extracurricular activities. *State on behalf of Kaaden S. v. Jeffery T., supra*. Other relevant considerations include stability in the child's routine, minimization of contact and conflict between the parents, and the general nature and health of the individual child. *Id*.

No single factor is determinative, and different factors may weigh more heavily in the court's analysis depending on the evidence presented in each case. *Id*. The one constant is that in any proceeding involving a child, the best interests of the child shall be the standard by which the court adjudicates and establishes any custody, parenting time, visitation, or other access determinations as well as resolution of conflicts affecting each child. *Id*.; § 43-2921.

Here, the district court found that both parties are fit parents who love and care for their child, and we agree. Despite the circumstances of their romantic relationship with each other, they have worked together to modify the temporary order and agreed to a parenting time arrangement that worked for them, which is commendable. We also agree with the district court that both parents have been actively involved in the child's life but that Callahan has been more of the primary caretaker, although that is due, in some part, to the distance between Kearney and York both at the time the parties lived together and afterwards. We understand the district court's reasoning for granting Callahan primary physical custody as it relates to the child's young age and need for stability as well as the understanding that a week on, week off arrangement would not be feasible once the child enters kindergarten. Thus, the court's desire to begin a schedule now that is more easily maintained into the future is reasonable. This is particularly true here where Callahan expressed concern that the minor child would struggle in a joint physical custody arrangement as she has seen with her older child. A desire to maintain more stability and consistency also supports the court's decision to continue primary physical custody with Callahan, instead of Galaway, once the child enters kindergarten.

In short, although the district court could have awarded the parties joint physical custody or awarded primary physical custody to Galaway when the child begins kindergarten, it elected not to do so and explained its reasoning for those decisions. The question is not whether we would have awarded the same physical custody arrangement as did the district court, but whether the district court's decision constitutes an abuse of its discretion. A judicial abuse of discretion exists

when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). It was within the court's discretion to find that the child's best interests would be served by awarding primary physical custody to Callahan both now and once the child begins kindergarten. We therefore affirm the court's decisions regarding physical custody.

*Child Support.*

Galaway alleges that the district court's child support calculation was erroneous for two reasons. He first claims that the court should have calculated child support using worksheet 3, the joint physical custody worksheet, rather than the sole custody worksheet, because of the number of days of parenting time he received. Additionally, he argues that the court should have utilized his 2020 income for child support purposes instead of an average of his income over the previous 3 years. We disagree with both of his arguments.

In general, child support payments should be set according to the Nebraska Child Support Guidelines. *State on behalf of Emery W. v. Michael W.*, 28 Neb. App. 956, 951 N.W.2d 177 (2020). Neb. Ct. R. § 4-212 (rev. 2011) of the child support guidelines sets forth the application of worksheet 3 as follows:

> When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3. When a specific provision for joint physical custody is ordered and one party's parenting time is 109 to 142 days per year, the use of worksheet 3 to calculate support is at the discretion of the court. . . . For purposes of these guidelines, a "day" shall be generally defined as including an overnight period.

Galaway attempts to calculate the number of days of parenting time he received, estimating that the number "gets very close to the 142-night threshold for a rebuttable presumption" as a basis for his argument that support should be calculated using worksheet 3. Brief for appellant at 33. What is missing, however, is a specific provision for joint physical custody. Under both scenarios outlined in § 4-212, use of worksheet 3 arises not only based upon the number of days of parenting time each parent receives, but also when the court orders "a specific provision for joint physical custody."

We recognize that where a parenting plan effectively establishes a joint physical custody arrangement, courts will so construe it, regardless of how prior decrees or court orders have characterized the arrangement. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). In prior cases, we have looked past the labels used by the trial court when describing the physical custody arrangement and have focused instead on the actual terms of the parenting plan adopted by the court, and where the child is spending roughly the same amount of time at each parent's residence, allowing both parents to exert continuous blocks of parenting time for significant periods of time, we have found those arrangements meet the statutory definition of joint physical custody. See *id*. Thus, it is the court's allocation of parenting time that drives the physical custody label, not the other way around. *Id*.

Here, however, we do not find that the arrangement the district court ordered meets the statutory definition of joint physical custody, nor does Galaway argue that it does. Although he receives parenting time Wednesday through Sunday every other week, that amounts to a 4 day block out of every 14 days, whereas Callahan received the other consecutive 10 days of that time period. The arrangement in this case, therefore, is properly classified as primary physical custody with Callahan. Accordingly, because there is no specific provision for joint custody, the court did not err in failing to use worksheet 3 to calculate child support.

Galaway additionally argues that the court erred in averaging his income over a several year period in order to calculate his income for child support purposes. He asserts that instead, the court should have used his 2020 income, which he claims more accurately depicts his actual income.

The child support guidelines provide that in calculating the amount of child support to be paid, the court must consider the total monthly income, which is defined as income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages and includes income that could be acquired by the parties through reasonable efforts. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017); Neb. Ct. R. § 4-204 (rev. 2020).

The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead it has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Marshall v. Marshall, supra*. Thus, income for the purposes of calculating child support is not necessarily synonymous with taxable income. *Id*. We take this flexible approach in determining a person's income for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Id*. The child support guidelines provide that in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent of contribution of each parent. *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007).

In the present case, Galaway argues that his 2020 earnings more accurately reflect his income because his 2017, 2018, and 2019 tax returns include additional earnings from side jobs that he testified he will no longer be working. Galaway did not testify that he was not going to do side jobs at all; rather, he was asked whether it would be fair to say that he was "not going to do those side jobs as much because [he was] going to spend more time with [his] kids," and he agreed that that would be a fair statement. Similarly, with respect to snow removal specifically, he explained that typically he would receive a call asking if he was available to do snow removal work in the winter, and now, if he has his children, he "won't be as available as [he has] been" to do snow removal work.

Galaway also admitted that he receives sponsorships from racing and that he has not yet claimed those as income for tax purposes. There was no evidence presented as to the value of the sponsorships.

We note that Galaway's pay from his full-time employment of $24 per hour equates to a monthly income of $4,160, and thus, the difference between that amount and the income utilized by the district court of $4,292 is $132 per month. Given this slight difference combined with the evidence that he may continue working side jobs on occasion and that he has unaccounted for

sponsorships, we do not find that the district court abused its discretion in calculating Galway's income for child support purposes.

## CONCLUSION

The district court did not abuse its discretion in awarding primary physical custody of the parties' minor child to Callahan or in its calculation of child support. We therefore affirm the court's order.

AFFIRMED.