IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


MCNULTY V. MCNULTY


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MAKAYLA N. MCNULTY, APPELLEE,

V.

SEAN T. MCNULTY, APPELLANT.


Filed March 8, 2022.    No. A-21-446.


Appeal from the District Court for Dawson County: JAMES E. DOYLE IV, Judge. Affirmed.

Shane M. Cochran, of Cochran Law, P.C., L.L.O., for appellant.

Claire K. Bazata, of Berreckman & Bazata, P.C., L.L.O., for appellee.


PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Sean T. McNulty appeals the decree entered by the Dawson County District Court dissolving his marriage to Makayla N. McNulty. Sean claims the district court erred by denying his motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to change venue. He also challenges the court's award of custody and parenting time, and the court's finding that a house in Kimball, Nebraska, was marital property. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Sean and Makayla were married in August 2016 in Gothenburg, Dawson County, Nebraska. At the time of their marriage, the parties lived in Colorado, but they moved to Sidney, Cheyenne County, Nebraska, that fall. Sean and Makayla have two children: Blake McNulty, born in 2015, and Bennett McNulty, born in 2018.

On September 20, 2019, Makayla filed a complaint for dissolution of marriage in the district court for Dawson County. She stated that her address was in Gothenburg, and that she was a resident of Dawson County. She stated that Sean's address was in Sidney. Makayla sought temporary and permanent custody of the parties' children, child support, alimony, an equitable distribution of the marital property and debts, court costs, and attorney fees. Makayla also filed motions for temporary custody and allowances.

On October 11, 2019, Sean filed a "Motion to Dismiss or in the Alternative to Change Venue." He alleged that Makayla was not a resident of Dawson County at the time she filed the complaint, and that the action should have been brought in Cheyenne County. Sean asked the district court to dismiss the action for lack of subject matter jurisdiction or, in the alternative, to transfer venue to the district court of Cheyenne County because Dawson County would be inconvenient for witnesses. The district court "overruled and denied" Sean's motion.

In December 2019, the district court awarded the parties joint legal custody of the children, with temporary physical custody awarded to Makayla. Sean was to have parenting time from 6:30 p.m. on Thursday to 6 p.m. on Sunday on the first, second, and fourth weekends of each month until further order of the court. The parties were to meet in Paxton, Nebraska, for all parenting time exchanges. Sean was ordered to pay temporary child support in the amount of $1,509 per month for the parties' two children.

On January 21, 2020, Sean filed an "Answer and Cross Complaint for Dissolution of Marriage." He sought temporary and permanent custody of the parties' children, temporary and permanent child support, an equitable division of the marital property and debts, costs, and attorney fees.

On March 23, 2020, the parties filed a stipulation and agreement to modify temporary orders, including a recalculated child support worksheet wherein Sean's temporary child support obligation would now be $1,092 per month. The district court approved the stipulation. On April 1, the court ordered that during the summer of 2020, the parties were to have parenting time with the children on a "week-on/week-off rotation."

2. TRIAL

The 2-day trial was held on March 23 and April 19, 2021. By agreement of the parties, several witnesses appeared remotely by video conference. Sean and Makayla appeared in person with their respective counsel. Several witnesses testified and numerous exhibits were received into evidence. We summarize the evidence relevant to the issues on appeal.

(a) Evidence Regarding Parties' Relationship and Parenting

Makayla, 27 years old, and Sean, 33 years old, both testified at trial. Makayla was currently employed at a law firm in Gothenburg; she worked "[a]bout 40" hours per week, with a daily schedule of approximately 8 a.m. to 5 p.m. She was previously employed as a dental assistant in Cozad, Nebraska, and, before that, in Sidney. Sean was currently employed by the federal government, Department of Energy, as a substation technician; he worked four 10-hour days Monday through Thursday each week. He was previously employed as a substation technician for a different employer; his regular work schedule was four 10-hour days Monday through Thursday each week.

According to Makayla, she had been the primary caregiver for the children since their births. She stated that when the parties were still together, "I did pretty much everything for [the children]; diaper changes, bath, fed them, I nursed them, got up with them in the middle of the night." When asked if Sean ever helped with any of the childcare, Makayla responded, "Rarely." She said he would play with the children "occasionally" and would help put Blake to bed. Makayla did not leave the children home alone with Sean often because "[h]e would always be overwhelmed by the time I got home." Sean, on the other hand, testified that prior to their separation the parties "did a pretty good job" of parenting together, and he believed that they were equal. He said, "We had different roles, and we took on each role as a team, and we -- we understood each others' [sic] roles in the -- in the parenting." Sean's mother watched the children during the day when Makayla and Sean worked.

As for discipline, Makayla said that she and Sean both "spank[ed]" the children, but "he would spank extremely hard and multiple times to where [she] was uncomfortable with how he was disciplining." If Makayla tried to intervene, "the blame was put on me that I wasn't allowing him to discipline his child like he wanted to." On cross-examination, Makayla was asked if she ever used something called a spanking stick. She responded, "one time," and then described it as "kind of similar to a paper towel roll, but it . . . would hold like chair covers from like my office," and was thicker than a normal paper towel roll. Sean testified that "[e]very time that spanking was necessary, [Makayla] would use this device," and it was not just one time like Makayla said. Sean used "[a]n open hand, palm," when he spanked the children.

Makayla said that Sean would frequently not speak to her during their marriage. He would "get mad over something, and he would go days without talking to me. He would just like exclude himself from anything, wouldn't help parent, was always in the garage or on his phone[.]" When asked if there were times when he would go without talking to Makayla, Sean responded, "That is my form of dealing with a stressful situation." When asked how long he went without speaking to her, he responded, "I'd go a day or two. I believe our last argument before the separation I think was three days." Makayla stated that during the times when Sean would not speak to her he would speak to the children, but he did not help parent. When asked what she meant by that, Makayla stated, Sean "would say things to the boys that made it harder for me to do things I needed to do. Like he would . . . go to Blake and say, 'Mommy's mean,' or, 'Let's leave Mommy,' and tell him to go get into the pickup and, you know, things like that, like, 'Mommy's mean to Daddy.'" Makayla was asked if there was anything else Sean would do when he was upset with her. She responded,

> I guess the . . . verbal abuse was probably the worst, that and emotional, called me names in front of the kids. He'd call me a [expletive]. He'd called me ungrateful, disgusting, a [expletive], worthless. He would kick objects . . . in my general direction, throw things. There was one time he punched a wall.

She said this behavior occurred every week and was witnessed by the children. During his testimony, Sean denied and "[did not] recall" saying to the boys that Makayla was mean. "I would not lead them to -- to think that their mother was mean." He also denied calling Makayla names in front of the children.

On Thursday, September 19, 2019, Makayla planned to leave with the children and go to Gothenburg. She testified,

> Sean claimed that . . . I didn't tell him that I was going to be leaving on Thursday. That was always my plan. And . . . he told me it's a good thing that I didn't leave right away . . . because he wouldn't have gotten to say goodbye to the kids. And then he said he would have called the cops on me and said I was kidnapping them.
>
> He grabbed Blake and tried to put him into his personal pickup, saying that he was going to take him and that we could leave when they got back.

Makayla said that Blake cried for her, and that she had to call Sean's mother. After his mother arrived, Sean "calmed down a little bit." When asked when she quit her job in Sidney, Makayla replied, "I called my employer the Friday after I left." She was asked if that would have been the very next day, and she responded, "Correct"; that was the same day that she filed the divorce action.

Sean also testified about the parties' plans the weekend Makayla left with the boys. Sean stated that he was going to the motocross track for a weekend of racing and Makayla and the boys were going to go to Gothenburg "for a parade, a festival." Makayla planned to leave Thursday night, "and she waited for me . . . to get home so I could say goodbye." "[A]n argument occurred, emotional conversation. . . . [S]he was going to leave and I was not okay with it at that point. So at one point, I . . . had picked Blake up and I said, 'We're going to ride dirt bikes.'" "[W]e walked towards the pickup, and that's when she had cut us off, and at that point is when Blake started throwing a fit and crying." Sean said, "[S]o Thursday night is when they left, and then Friday morning is when I went to the track. I camped there until Sunday evening. That's when I returned home to find out that all of the boys' clothes were gone, toys were gone, and Makayla's belongings were gone." Sean was "very shocked" by Makayla filing for divorce.

Makayla currently resides with her parents in their home in Gothenburg. The children have friends and extended family in Gothenburg. Makayla's parents helped her with the children, and she sought their help "[m]ainly after school for Blake" because "[m]y mom and Blake get out of school at the same time"; Makayla's mother works at the school Blake attends. Makayla planned to move out of her parents' home, but she had not yet done so "because of this divorce." She plans to stay in the Gothenburg area.

Sean testified that when the children are with him on the weekends, he makes them breakfast and they go to the track and ride dirt bikes or play with children in the neighborhood, but "the weekends usually are filled with their events from wrestling or races"; both Blake and Sean do motocross races. Sean said that he attends all of the children's activities, but that Makayla does not; "she does not attend not even ten percent" of the activities that occur on the weekends that Sean has the children. In response, Makayla stated, "I always want to go wherever my kids are. It's hard when their majority [of events] are in Western Nebraska, they're in Colorado, they're in Wyoming." She explained that the activities are often on the weekends when the children are with Sean, and Makayla had already driven roundtrip to Paxton to do the parenting time exchange at the beginning of Sean's weekend, and she would have to do the same at the end of Sean's weekend.

Makayla stated that when Blake comes back from a weekend with Sean, Blake "doesn't want to listen." When he is not returning from a weekend with Sean, Blake is "just in his routine

a lot better." The temporary order gave Sean three weekends per month, so there was only one weekend a month that Blake did not have to go anywhere. When asked if she felt that the constant changing was difficult for Blake, Makayla responded, "I do." Makayla believed it was in the children's best interests to remain in her primary custody, and that Sean having parenting time every other weekend would be better for the children, but she agreed that Sean could have every other week in the summer.

Sean, however, believed he could provide a better environment for the children and that it was in the children's best interests for the district court to grant him physical custody; he thought continuing with joint legal custody was "fair." Sean's proposed parenting plan was for Makayla to have parenting time on the first, second, and fourth weekends of every month; that was the same parenting time Sean had under the temporary order. Sean's mother testified that she would be available to provide daycare for the children if Sean received custody.

Troy Franzen (Troy) is Makayla's father. He testified that Makayla and the boys have lived with him and his wife, Heather Franzen (Heather), in Gothenburg since September 2019. He said that Makayla takes Bennett to daycare, and Heather takes Blake to school because she works at his school. Heather usually picks both boys up because they are done by 4 p.m. and Makayla works until 5 p.m. According to Troy, Makayla provides that majority of the care for the children, but "[w]e all kind of just chip in, help with pretty much everything." At their home, Troy makes breakfast, Heather makes the evening meal, and Makayla "usually takes care of the noon [sic] and everything else; bathing, bedtime." The boys each have a bed in their own rooms, but Bennett "likes to sleep with . . . Blake." Sean testified that at his house, the boys sleep in bunk beds in the same room because "they would not sleep in separate rooms," "it was a battle to get them to go to bed."

Troy stated that Makayla is "an awesome parent" and that she would do anything for the boys, "[t]hey're always first." For discipline, Makayla "usually sits down with them and talks to them and tells them what -- kind of what they did wrong and lets them know that that is not allowed[.]" Troy believed that Makayla and the children had a "[v]ery close" bond and they were "always doing something together."

Prior to September 2019, Troy and Heather tried to visit Makayla and her family "at least once a month." From what Troy observed, "Makayla pretty much had to do everything. Sean probably was most the time either out in the garage working on something or doing something else." Since the parties' separation, when Blake comes back from spending a weekend with Sean, Blake is "completely different than when he goes there"; he is "very mouthy" and does things he knows he is not supposed to be doing, "he is very hard to discipline," and "usually it takes a couple days for us to kind of get him back into his routine again."

Michelle Ostergard testified that she was a preschool teacher at a childcare center in Gothenburg. Blake attended the childcare center from November 2019 until August 2020, when he started kindergarten. While Blake was at the childcare center, Ostergard observed a pattern where Blake would push and hit following weekends he spent with Sean; the behavior would last 2 or 3 days. On cross-examination, Ostergard acknowledged that it was not unusual for a child to act out after visiting a noncustodial parent, and that Blake's behavior was not different from other children in similar situations. Bennett still attended the center 5 days each week and Ostergard had no concerns about him.

Jamie Slonecker testified that she is a licensed independent mental health practitioner. Slonecker saw Blake four times between February and August 2020 because Makayla had concerns about behaviors Blake was displaying, like pushing boundaries and rules; Makayla wanted Blake to have someone to talk to about his parents' separation and to be able to express his feelings and learn to communicate better about what he was experiencing. Slonecker stated that Makayla contacted her four or five times since August to talk about how Blake was doing and asking for "suggestions for structure and routine and . . . being able to communicate and express feelings." Slonecker did not observe anything in counseling that gave her cause for concern regarding Makayla's parenting. Slonecker never met Sean.

Sean called four friends to testify on his behalf. The collective testimony was that Sean loves his children, and that no cause for concern was observed regarding his parenting. One of Sean's friends stated that when the parties were still together, the friend observed neither one providing more care for the children than the other parent; "it was just different types of parenting." "Sean was definitely more on the side of . . . the fun one, you know, played a lot more with them, where Makayla was more the maternal parent."

(b) Evidence Regarding Finances and Kimball House

Makayla testified that she and Sean lived together in Colorado from the summer of 2013 until 2016; according to her testimony, they filed under Colorado common law marriage for their 2014 and 2015 tax returns. Sean denied that the parties ever held themselves out to be husband and wife while living together in Colorado; they never called each other husband or wife. However, Sean "believe[d]" they "filed together for tax purposes."

Sean testified that while living in Colorado, the parties did not have any joint bank accounts and they kept their bills separate. The parties initially rented a place to live, however they purchased a house in 2014. Sean said his name was on the mortgage, but he could not recall if Makayla's name was on the mortgage or not. When asked who paid the mortgage, Sean replied, "I did." And when asked if Makayla paid any rent to him for the mortgage, Sean replied, "No." In 2016, the parties bought their house in Sidney, Nebraska, after they got married. Sean's "name is on the house," but Makayla's name is not; Makayla's name was not on the loan for the house either, because, according to Sean, "It was at [sic] our best interest to only have my name on the loan as we got a better interest rate." Sean did not dispute that the house in Sidney was "marital." After the parties were married, Sean's paycheck went into his own separate account; Makayla did not have access to that account. Makayla's paycheck went into the parties' joint account.

Both parties also testified about a house in Kimball. Makayla testified that "[a] couple months before we got married in 2016," the house in Kimball was purchased for Sean's parents. Makayla was asked further questions regarding the Kimball house.

Q [by her counsel]. Was there a -- a loan or a mortgage on that property that you're aware of?

A. I assume so, yes.

Q. Do you know what the value of that mortgage was?

A. I don't.

Q. Do you know whether Mr. McNulty continued to make payments towards that home --

A. Yes.
Q. --while you were married?
A. Yes.
Q. And did his parents or his family provide any rent to you to live in that home?
A. No. If they did, it was very rare.
Q. Okay. Are they still residing in that home, to your knowledge?
A. Yes.

The district court further inquired of Makayla regarding the house in Kimball.

THE COURT: [T]he home in Kimball. When was that purchased?
[Makayla]: I believe it was purchased a few months before our wedding ceremony.
. . . .
THE COURT: All right. How was that paid for?
[Makayla]: I believe by Sean.
THE COURT: Did he pay for it while you were married?
[Makayla]: Yes. I would assume so.
THE COURT: So the payments occurred a month or two before you were married and then after you were married.
[Makayla]: Yes.

Sean testified that he purchased the Kimball house for his parents. The house was a "foreclosure" and a "fixer-upper," and he paid $19,500. A "Special Warranty Deed" for the Kimball house was received into evidence as exhibit 48. The deed, executed on July 26, 2016, and recorded on August 15, states that the bank conveyed the house to Sean for consideration of $19,500. Sean testified that he paid cash for the house and "never had a loan or mortgage" on the house. When asked if it was all money he had prior to the marriage, Sean replied, "Yes. Correct." Sean still owned the house; Sean's parents were purchasing the house and had a "verbal" rent-to-own agreement with him, with "very flexible" payments as his parents "are not in a financially fit position."

Sean does not believe that the value of the Kimball house has increased since he purchased it because "it is a deep fixer-upper" and "it's not in great shape at all." However, on the property statement prepared for trial, Makayla valued the house at $50,000, based on the Kimball County Assessor's 2020 value of $49,570; the assessor's value was received into evidence as exhibit 13.

### 3. DISTRICT COURT'S DECREE

In its decree entered on April 29, 2021, the district court dissolved the parties' marriage and divided the parties' marital estate, resulting in a judgment of $45,800 in favor of Makayla and against Sean for equalization of the property and debt division; a payment plan was established. As relevant to the appeal, the court determined that the Kimball house was marital property.

The district court awarded the legal and physical custody of the children to Makayla. Pursuant to the court's parenting plan, Sean was to have parenting time with the children every other weekend from 6 p.m. on Friday until 6 p.m. on Sunday. During the summers, the parties were to have parenting time on alternate weeks, with exchanges occurring on Fridays at 6:30 p.m.

A holiday parenting time schedule was also established. The parties were to meet in Paxton for all parenting time exchanges. Sean was ordered to pay child support in the amount of $1,097 per month for the parties' two children, retroactive to April 1, 2021. The court stated that "[t]he retroactive commencement of child support and the unpaid temporary child support establishes an arrearage of $2,555.29," and a judgment for such amount was entered against Sean and in favor of Makayla; a payment plan was established. Neither party was awarded alimony. The court entered a judgment of $1,000 against Sean and in favor of Makayla as an award of attorney fees.

Sean appeals.

## III. ASSIGNMENTS OF ERROR

Sean's brief does not contain a separate section assigning error to the district court. While the brief's argument section does contain headings purporting to assign error, the Nebraska Supreme Court has emphasized that such headings do not satisfy the requirements of our appellate rules. See, *In re Interest of Mekhi S. et al.*, 309 Neb. 529, 960 N.W.2d 732 (2021); Neb. Ct. R. App. P. § 2-109(D)(1) (rev. 2021). This affects our standard of review. *In re Interest of Mekhi S. et al., supra*.

## IV. STANDARD OF REVIEW

Where the assignments of error consist of headings or subparts of arguments and are not within a designated assignments or error section, an appellate court may proceed as though the party failed to file a brief, providing no review at all, or, alternatively, may examine the proceedings for plain error. *Id.*

Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law. *In re Interest of Mekhi S. et al., supra*. See, also, *Camden v. Papio-Missouri River NRD*, 22 Neb. App. 308, 854 N.W.2d 334 (2014) (question of jurisdiction is question of law, which appellate court resolves independently of trial court; however, findings as to any underlying factual disputes will be upheld unless clearly erroneous).

## V. ANALYSIS

Sean claims the district court erred by denying his motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to change venue. He also challenges the court's award of custody and parenting time, and the court's finding that the house in Kimball was marital property rather than his premarital property.

### 1. SUBJECT MATTER JURISDICTION AND VENUE

We begin, as we must, by determining whether the district court had subject matter jurisdiction over the dissolution action.

Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved. *D.W. v. A.G.*, 303 Neb. 42, 926 N.W.2d 651 (2019).

Pursuant to Neb. Rev. Stat. § 24-302 (Reissue 2016), district courts have general, original, and appellate jurisdiction in all matters, both civil and criminal, except where otherwise provided. Dissolution actions "shall be brought in the district court of the county in which one of the parties resides." Neb. Rev. Stat. § 42-348 (Reissue 2016). In *Small v. Small*, 229 Neb. 344, 347, 427 N.W.2d 42, 44 (1988), the Nebraska Supreme Court stated, "The district court for a county cannot acquire jurisdiction over dissolution proceedings unless one of the parties is a resident of that county at the time the original petition is filed." In *Huffman v. Huffman*, 232 Neb. 742, 750, 441 N.W.2d 899, 905 (1989), the Nebraska Supreme Court explained, "[I]f one of the parties to a dissolution action has had a Nebraska domicile for the duration prescribed by § 42-349, a party may commence a dissolution action under § 42-348 in the county where one of the parties lives and is not required to commence the action in the domiciliary county of either party to the dissolution action."

In the present case, both parties had a Nebraska domicile for 1 year prior to the filing of the complaint, thus meeting the requirement of Neb. Rev. Stat. § 42-349 (Reissue 2016). Section 42-349 having been met, the dissolution action could be commenced in the county where one of the parties lived. See *Huffman v. Huffman, supra*. See, also, Neb. Rev. Stat. § 42-352 (Reissue 2016) (proceeding under §§ 42-347 to 42-381 shall be commenced by filing complaint in district court; proceeding may be heard by county court or district court as provided in § 25-2740). In proceedings under sections Neb. Rev. Stat. §§ 42-347 to 42-381 (Reissue 2016 & Cum. Supp. 2020), the court shall have jurisdiction to inquire into such matters, make such investigations, and render such judgments and make such orders, both temporary and final, as are appropriate concerning the status of the marriage, the custody and support of minor children, the support of either party, the settlement of the property rights of the parties, and the award of costs and attorney's fees. § 42-351.

Even though the question of jurisdiction is a question of law, which an appellate court resolves independently of the trial court, findings as to any underlying factual disputes will be upheld unless clearly erroneous. See *Camden v. Papio-Missouri River NRD, supra*. We find no error in the district court's finding that Makayla was living in Dawson County at the time her complaint was filed. Accordingly, the Dawson County District Court had subject matter jurisdiction over the dissolution proceeding.

As to Sean's request to change venue, Neb. Rev. Stat. § 25-410 (Cum. Supp. 2020) does allow the district court to transfer any civil action to the district court of any other county in the state for the convenience of the parties or witnesses. We find no plain error in the district court's finding that Dawson County was not an inconvenient forum. Accordingly, we find no plain error in the district court's decision to overrule and deny Sean's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, to change venue.

2. CUSTODY AND PARENTING TIME

Sean contends he should have been awarded custody of the children, or alternatively, he should have been awarded an additional weekend of parenting time each month.

When deciding custody issues, the court's paramount concern is the child's best interests. *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

    (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

    (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

    (c) The general health, welfare, and social behavior of the minor child;

    (d) Credible evidence of abuse inflicted on any family or household member. . . ; and

    (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Smith v. King, supra*.

The district court thoroughly considered the relevant factors before making its custody and parenting time decision. For example, the court found that Makayla "was the primary caregiver and nurturer of the children," and that the children were attached to both parents, "but the attachment and the bonds between the children and Makayla are more extensive, complete, and potent than those between the children and Sean." The court expressed concern about Sean's record of engaging in physical confrontations with others, Sean's failure to regularly pay child support, and Sean's "receipt, retention, and concealment of the COVID-19 stimulus funds he received during the pendency of the case." It noted that Sean did not disclose the funds on the joint property statement or in his testimony; it was only revealed during cross-examination. The court pointed out that the "stimulus funds of more than $5,000" could have been paid towards Sean's child support arrearage. The court added, "Sean's explanation for his non-disclosure of the funds was incredible and unconvincing."

The district court also found that "[t]he history of the parents' care for the children supports the conclusion the stability and security offered by Makayla is greater." "Makayla was focused on the children in a more wholistic manner than Sean. Sean provided substantial care for the children, but much of such care centered around activities of importance to him, such as the motocross and wrestling," and "there was evidence to support the inference Sean is less flexible and more demanding of the children than is appropriate for their age." The court found that both parents have a "satisfactory capacity" to provide for the children's physical care and emotional needs, but Makayla has "more fully realized" her capacity than has Sean. The court indicated it had considered a joint custody arrangement, but that

[u]nder the facts of this case, joint decision-making by the parents is not in the children's best interests. The parents are unable to communicate appropriately face-to-face, there's a level of distrust, and it appears there is an issue of a fundamental disagreement over how much and to what extent Sean can exercise control over the decision-making of Makayla.

The court described how it considered the demeanor of witnesses as they testified, such as directness of answers, emphasis placed on words, facial expressions, eye movements, "furtive or meaning glances, shrugs, yawns, self-possession or embarrassment." The court concluded that "[t]he demeanor evidence weighed strongly in Makayla's favor."

Sean largely takes issue with the district court's view of the evidence. However, when evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017).

Having reviewed the record, we find no plain error in the district court's decision to award legal and physical custody of the parties' children to Makayla, subject to Sean's parenting time as set forth in the court's parenting plan. Nor do we find any plain error in the court's decision to award Sean parenting time on alternating weekends.

### 3. KIMBALL HOUSE

Sean contends the district court improperly characterized the Kimball house as marital property.

In a dissolution of marriage proceeding, "'[i]f the parties fail to agree upon a property settlement ... the court shall order an equitable division of the marital estate.'" *Dooling v. Dooling*, 303 Neb. 494, 507, 930 N.W.2d 481, 495 (2019). Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Dooling v. Dooling, supra*. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Id.* Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.*

The burden of proof rests with the party claiming that property is nonmarital. *Marshall v. Marshall, supra.* A nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). A spouse's own testimony can establish a "'"tracing link,"'" i.e., tracking an asset to a nonmarital source. *Id.* at 364, 934 N.W.2d at 495. See, also, *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Of course, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt, supra*. Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id.*

In concluding that the Kimball house was marital property, the district court stated:

The determination of the classification of the Kimball home is determined, in part, by the circumstances of the parties at the time the property was purchased. The parties began cohabiting in a committed, exclusive, intimate relationship in 2014 while living in

Colorado. Both during the cohabitation and after their August 2016 marriage, Sean and Makayla maintained separate bank accounts and it appears the earnings of each were deposited in such separate accounts. Nevertheless, the parties throughout the committed, exclusive, intimate relationship contributed to the living expenses of themselves and their first-born child. The deed to the Kimball house was filed 12 days before the parties' marriage and was purchased while the parties were living in Colorado. The parties purchased their Sidney home and moved there in October of 2016. The evidence was clear and convincing the Kimball house property was purchased at a time when the parties considered themselves bound by their expressed intentions to marry and they actively held themselves out as bound to one another under the bonds of marriage. This was evidenced by the manner in which they manifested their intention to enter into a marital relationship, including their exchange of rings; their sending of invitations to their wedding; and other incidents of their cohabitation, including the 2015 birth of their oldest child, and the manner in which they supported each other, before the August 2016 wedding. The Kimball house was acquired at a time when Sean and Makayla were living together with all the indicia of a marital relationship, including an expressed intention to enter into a marital relationship and their conduct of mutual support and their commitments to each other in their exclusive, intimate relationship. The Kimball house is marital property and is included in the martial estate.

We find no plain error in the district court's inclusion of the property as marital, but for a reason different than that contained in its order. See *Keith v. Data Enters.*, 27 Neb. App. 23, 925 N.W.2d 723 (2019) (if trial court arrives at correct result even though it uses reason different from that expressed by this court, its judgment will be upheld).

The district court included the property as a marital asset, in part, due to it being "acquired at a time when Sean and Makayla were living together with all the indicia of a marital relationship." However, neither party asserted at trial that a marital relationship existed at the time the property was acquired; rather, both agreed title was acquired prior to marriage. However, Sean failed to meet his burden of proof because the evidence was controverted as to whether a mortgage existed that was paid postmarriage and there was no evidence that all the other costs of ownership were paid by either Sean's parents or with premarital funds. Although Sean's testimony was evidence for the district court to consider in determining whether the asset was tracked to a nonmarital source, the court nevertheless had the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or lack thereof. See *Burgardt v. Burgardt, supra*.

Given the limited and conflicting evidence from the parties on this issue, we cannot say the district court's determination that the Kimball house was marital property constitutes plain error.

## VI. CONCLUSION

For the reasons stated above, we affirm the decree in all matters.

AFFIRMED.