IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


LAVINESS V. LAVINESS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


WENDELL D. LAVINESS, APPELLANT,

V.

JESSICA L. LAVINESS, APPELLEE.


Filed October 4, 2022.    No. A-21-839.


Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.

Justin A. Quinn for appellant.

Adam E. Astley, of Astley Putnam, P.C., L.L.O., for appellee.


MOORE, RIEDMANN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Wendell D. LaViness (hereinafter referred to by his middle, and preferred, name "Donavon") appeals portions of the order of the Douglas County District Court dissolving his marriage to Jessica L. LaViness. Donavon contends that the district court erred in including untaxed income in determining child support, in awarding Jessica alimony, in failing to set off $35,572.62 as funds traceable to the sale of his premarital home, in improperly valuing the marital home, and in failing to order the sale of the marital home. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

The parties were married on May 12, 2007, and had two children during the marriage: Wyatt, born in 2012, and William, born in 2014. In April 2020, Donavon filed a complaint for

dissolution of marriage requesting the court equitably distribute the accumulated property and award him sole legal and physical custody of their two minor children. In her answer and counterclaim, Jessica requested the same, except she requested that the court award the parties joint legal and physical custody. In August, the court entered a temporary order awarding the parties joint legal and physical custody of the minor children, ordering Donavon to pay temporary child support of $125 per month, ordering Donavon to pay alimony of $400 per month, and granting Jessica temporary possession of the parties' marital home beginning on October 1.

The trial on the complaint and countercomplaint for dissolution of marriage was heard in July 2021. Donavon; Jessica; Courtney Meysenburg, a real estate agent; and Jonathan Jameson, a loan originator testified at trial.

The parties testified that they were married in 2007 but resided together prior to their marriage in a home purchased by Donavon. In 2006, Donavon purchased the home located on Fowler Avenue (Fowler house) for $196,450, which he titled solely in his name. Although Donavon declined to place Jessica's name on the title of the Fowler house, both parties used their income to pay for the joint home expenses. Jessica testified that she gave two-thirds of her monthly income to Donavon to pay expenses and that she liquidated her retirement account from a former employer to have the Fowler house painted. Additionally, because Donavon worked out-of-town 12 days out of a 14-day period, Jessica was primarily responsible for upkeep of the Fowler house and took care of the parties' children. Although the parties refinanced the Fowler house in 2010 and 2015, Jessica was not placed on the title even though she agreed to equally assume the mortgage with Donavon.

The family resided in the Fowler house until they sold it in 2017 for $240,000. After paying the mortgage balance of $176,083 and a $12,000 commission to the real estate agency, they received $51,760.24 in net proceeds from the sale of the home. Donavon placed the proceeds in a bank account which he testified was solely in his name. Donavon used $10,341.38 to pay Jessica's student loans which had been accumulated during the parties' marriage and paid $25,231.34 in closing costs for the parties' new home located on Potter Street (Potter house).

At the time of the trial, the parties still owned the Potter house and Jessica had exclusive possession of it pursuant to the temporary order. The children attended the school located next door to the Potter house and the children were actively involved in their school and neighborhood. Under the terms of a mediated partial parenting plan, the parties agreed to joint legal and physical custody of the minor children. Both parties agreed that it was in the children's best interests for them to continue at their school, however, they disagreed on how the Potter house should be divided in the dissolution. Donavon requested that the court order the sale of the Potter house, whereas Jessica requested that she be awarded the Potter house so that she could keep the children within the school district and remain close to their friends and neighbors. Jessica testified that if the parties were ordered to sell the home, the children would no longer qualify to attend their current school because the district required residency within the district to attend school there. Jessica stated that their children had grown accustomed to the home, neighborhood, and school, and were involved in activities and had developed close friendships. As a result, Jessica stated that she believed it was in the children's best interests for them to remain in the residence as opposed to selling it. Donavon, on the other hand, argued that the children would be able to remain in their school so long as Jessica obtained another residence within the district.

The parties also disputed the valuation of the Potter house. Donavon obtained an appraisal of the home and the appraiser valued the Potter house at $345,000 as of April 7, 2021. However, Donavon testified that at the time of the July 2021 trial, the value of the home had increased due to market fluctuations as evidenced by a market analysis completed by real estate agent Courtney Meysenburg. Meysenburg completed a market analysis of the Potter home finding that the home could be listed and sold at a higher price if the home was in "excellent condition." Meysenburg testified that she would list the Potter house between $372,000 and $375,000. However, Meysenburg admitted that she was not expressing an opinion as to the home's fair market value; rather, her valuation was an indication of the price at which she would likely list and sell the home. Meysenburg admitted that the appraisal value reflected the average price of homes in the area of the Potter house but opined that prices had increased seven percent since the appraisal was completed.

Jonathan Jameson, a loan originator, testified that he was working with Jessica to help her refinance the Potter house. He indicated that he believed with Jessica's $55,000 annual income, along with Donavon's $125 monthly child support payment and $400 per month in alimony, Jessica would qualify to refinance the home in the amount of $275,000 which would produce a $2,050 monthly payment obligation. In the alternative, Jameson testified that without spousal support, Jessica could qualify to refinance at that value if she eliminated her vehicle loan.

In accordance with the partial parenting plan, both parties requested the court enter an order determining child support and expenses. Both Donavon and Jessica offered, and the court received, proposed child support calculations under the guidelines. The parties generally agreed to most of the calculations with the exception that Donavon disputed Jessica's claim that the calculation should include the value of Donavon's personal use of a company vehicle. At the time Donavon filed the complaint for dissolution, he owned a 2016 Chevy pickup for which he made a monthly loan payment of $382.99. After he obtained employment with RONCO, RONCO provided him with a company vehicle and permitted him to use that vehicle for his personal use. As a result, Donavon sold his 2016 truck in order to minimize his expenses. Donavon received a profit in the amount of $7,500 for the sale of his 2016 truck. Donavon was not required to pay taxes, registration, licensing fees, or any other expense associated with the maintenance or care of RONCO's vehicle. According to Donavon, his only expense for the vehicle was his obligation to pay for gas every other time he filled the tank. He stated that he attempted to contact a dealership to determine the cost to lease a similar vehicle but that the dealership indicated that they would not lease out a vehicle of like age. Additionally, Donavon stated that when he contacted RONCO to determine what amount was included in income on his W-2 for his use of the company vehicle, he was informed that there was no such attribution. Donavon testified that no income should be attributable to him for his personal use of the company vehicle. Conversely, Jessica requested that the court attribute $1,000 per month as tax exempt income, or an "in-kind" benefit, consistent with the expense that Donavon would have incurred had he maintained a personal vehicle.

The district court's decree dissolved the parties' marriage and awarded the parties joint legal and physical custody of Wyatt and William. Additionally, after finding that $350 per month of tax-exempt income, or "in kind" benefits, should be attributed to Donavon for the benefit he received from his personal use of RONCO's vehicle, the court ordered Donavon to pay child support of $224 per month. The court further awarded Jessica $250 per month in alimony for 36

months. The court denied Donavon's request to order the sale of the marital home and awarded the Potter house, which it valued at $345,000, to Jessica, subject to her obligation to refinance the home solely in her name. The court denied Donavon's request to set aside $35,572.62 in funds traceable to premarital property and awarded a $43,343.35 equalization payment to Donavon. Donavon has timely appealed to this court.

## III. ASSIGNMENTS OF ERROR

Donavon contends that the district court erred in (1) including $350 in untaxed income, or "in kind" benefits, from his use of a company vehicle in determining child support; (2) awarding Jessica $250 per month in alimony for 36 months; (3) failing to set off $35,572.62 as funds traceable to the sale of his premarital home; (4) failing to order the sale of the marital home and valuing the marital home at $345,000 instead of $375,000.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* However, where credible evidence is in conflict on a material issue of fact, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Marcovitz v. Rogers,* 267 Neb. 456, 675 N.W.2d 132 (2004).

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Kauk v. Kauk, supra*.

## V. ANALYSIS

### 1. "In-Kind" Benefit From Use of Company Truck

Donavon first argues that the district court abused its discretion in including $350 of tax exempt income, or an "in-kind" benefit, in the child support calculation due to his personal use of a company vehicle. He asserts that there was no evidence presented at trial that $350 is the value that he receives for the personal use of the company vehicle which he used for both personal and business reasons.

In *Guthard v. Guthard*, 28 Neb. App. 156, 164-65, 942 N.W.2d 792, 801 (2020), this court stated:

The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the [parties'] total monthly income. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). See Neb. Ct. R. § 4-204 (rev. 2020). Total monthly income is defined as the "income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax

- 4 -

credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. . . ." § 4-204 . . .

The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Thus, income for the purposes of calculating child support is not necessarily synonymous with taxable income. *Id*. We take this flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Marshall v. Marshall, supra*. Thus, a court is allowed, for example, to add "in-kind" benefits, derived from an employer or other third party, to a party's income. *Id.*

Examples of "in-kind" benefits which have been included in a party's income for assessing child support obligations include military housing benefits and subsistence allowances, free food and drink provided by employers, and rent or housing allowances provided by employers. See, *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001); *State on behalf of Hopkins v. Batt,* 253 Neb. 852, 573 N.W.2d 425 (1998) (military housing benefit and subsistence allowance included as income), *overruled on other grounds, State on behalf of Miah S. v. Ian K.*, 306 Neb. 372, 945 N.W.2d 178 (2020); *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994) (free food and rent provided by employers, who were also petitioner's parents, included as income); *Morrill County v. Darsaklis*, 7 Neb. App. 489, 584 N.W.2d 36 (1998) (use of home on farm included as income); *Robbins v. Robbins*, 3 Neb. App. 953, 536 N.W.2d 77 (1995) (value of food and drink provided by employer included in income), *overruled on other grounds, Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved on other grounds, Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

Here, the evidence showed that, prior to his employment with RONCO, Donavon had a monthly truck loan payment of $382.99 for his 2016 truck. After obtaining employment with RONCO, Donavon was provided a company vehicle which he was allowed to use for both business and personal purposes. As a result, Donavon sold his 2016 truck during the dissolution proceedings "to minimize his expenses." Donavon did not have to pay for taxes, licensing, or insurance on the company vehicle. In fact, Donavon's only vehicle-related expense was the cost of gas when he used the vehicle for personal reasons. At trial, Donavon asserted that the value attributed to him for his personal use of the company vehicle should be $0 which was the value that RONCO assigned to employees on their W-2 for use of company vehicles. Conversely, Jessica valued Donavon's personal use of the company vehicle at $1,000 per month which took into consideration out-of-pocket expenses associated with maintaining a personal vehicle including oil changes and insurance. For the purposes of calculating child support, the district court attributed $350 per month to Donavon as income for his personal use of the vehicle. This amount approximates Donavon's prior monthly loan payment obligation on his 2016 truck prior to its sale and represents a reasonable attribution of the "in-kind" benefit Donavon received for his personal use of the company truck on this record. Because income is not necessarily synonymous with taxable income and Donavon receives an "in-kind" benefit for his personal use of the company vehicle, we find

that the district court did not abuse its discretion in attributing $350 per month in assessing Donavon's child support obligation. This assignment of error fails.

## 2. ALIMONY

Donavon next argues that the district court erred in ordering him to pay $250 in alimony to Jessica for 36 months. Donavon argues that it is unjust to require him to pay alimony when Jessica has "extreme family support" including her family's willingness to pay her attorney fees, their willingness to assume Jessica's vehicle loan, their willingness to help Jessica refinance the marital home, and their willingness to provide free childcare for the children. Brief for appellant at 23. We note that the district court did not indicate its reasoning for awarding alimony to Jessica.

As recently stated by the Nebraska Supreme Court in *Simons v. Simons*, 312 Neb. 136, 178-79, 978 N.W.2d 121, 153-54 (2022):

Under § 42-365, "The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate." The court may order payment of such alimony by one party to the other as may be "reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party."

Accordingly, we have articulated four factors that are relevant to alimony: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or a just result. The ultimate criterion is one of reasonableness. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

Here, our de novo review of the record reveals that during the parties' 13-year marriage, both Donavon and Jessica were employed and contributed to payment of household expenses. In his job with RONCO, Donavon earns $80,000 per year. When the parties were first married, Jessica worked as a certified nursing assistant earning approximately $17 to $18 per hour; however, during the marriage, she obtained a college degree and her income increased to $54,000 per year.

Further, the record reflects that neither party gave up employment opportunities or interrupted their careers or educational opportunities. However, the record also establishes that Donavon earns more than Jessica. According to Donavon, his monthly income was $6,666.40 and his monthly expenses were $4,372. Jessica asserted that her monthly income was $4,609 and her monthly expenses were $4,203 including a $2,033 mortgage payment. The evidence at trial showed that Jessica was able to obtain pre-approval to refinance the marital home solely in her name conditional upon her being awarded $400 per month in alimony or if she retired the debt on her vehicle. This would allow her to maintain her home in the current school district and maintain continuity for the parties' children.

When considering the parties' disparity in income and the equity associated with this temporary allowance which will facilitate an affordable refinance of the home, we cannot say this award was untenable so as to deprive Donavon of a substantial right. Although this court may not have awarded the same amount of alimony as did the trial court, we cannot say that the trial court's award was an abuse of discretion. Accordingly, we find that this assignment of error fails.

### 3. SET-OFF

Donavon next argues that the district court abused its discretion in refusing to set off $35,572.62 as his premarital property which was traceable to proceeds received from the sale of the Fowler house. Donavon argued that from the proceeds received from the sale of the Fowler house, he made a $25,231.34 down payment on the Potter house and paid $10,341.28 of Jessica's student loans, and these traceable proceeds from his premarital home should inure to his benefit.

This court recently set forth the applicable law regarding the classification of property in *Parde v. Parde*, 31 Neb. App. 263, 272-73, ___ N.W.2d ___, ___ (2022):

> Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* If the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.*
>
> Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Kauk v. Kauk, supra*. The original capital or value of an asset may be nonmarital, while all or some portion of the earnings or appreciation of that asset may be marital. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020) (quoting *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017)). The burden of proof rests with the party claiming that property is nonmarital. *Kauk v. Kauk, supra*.
>
> The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of an asset's appreciation or income. *White v. White, supra*. Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the

- 7 -

account and (2) the growth is not due to the active efforts of either spouse. *Id.* Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property. *Id.* Passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id.* The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.* The active appreciation rule applies equally to appreciation or income during the marriage of any nonmarital asset. *Id.*

In *Onstot v. Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018), the Nebraska Supreme Court considered a claim that a residence purchased prior to a marriage was entirely premarital or, alternatively, that the equity in the home prior to the marriage was premarital. The *Onstot* court stated:

> [The appellant] purchased the residence located on Platte River Drive in 1990, approximately 9 years prior to the marriage. He testified he paid $58,800 for the property and took out a mortgage for the purchase in the amount of $48,000. He opined that the residence had a value of $100,000 at the time of the marriage in 1999. The district court found the entire equity in the residence to be marital property and ordered that it be divided equally between the parties.
>
> Because he purchased the residence prior to the marriage, [the appellant] claims that it is entirely premarital or, alternatively, that the equity he had prior to the marriage is premarital. As a general rule, property which one party brings into the marriage is excluded from the marital estate. However, the burden of proof to show that property is a nonmarital asset remains with the person making the claim.
>
> We agree that the equity in the residence at the time of the parties' marriage in 1999 was a nonmarital asset which, if established, should be set aside as [the appellant's] separate property. However, assuming [the appellant's] testimony established the value of the residence at $100,000 at the time of the marriage, he did not testify or supply any documentation as to whether the residence was either encumbered or unencumbered at that time and, if encumbered, to what extent. Because [the appellant] has failed to establish that there was any equity in the house at the time of the parties' marriage, he has failed to meet his burden of proving that the property is a nonmarital asset. We therefore conclude that the district court did not err in including the entirety of the equity in the residence in the marital estate.

298 Neb. at 903-04, 906 N.W.2d at 306.

Here, Donavon presented evidence that he purchased the Fowler house for $196,450 in May 2006 which was prior to the parties' May 2007 marriage. However, Donavon did not present any evidence regarding the Fowler house's value at the time of the parties' marriage in 2007; he did not testify or supply any documentation as to whether the residence was encumbered or unencumbered at that time; and, if encumbered, he did not testify or provide any documentation governing the extent of the encumbrance. Because Donavon failed to establish that there was any equity in the Fowler house at the time of the parties' marriage, he has failed to meet his burden of proving that the property is a nonmarital asset. We therefore conclude that the district court did

not err in including the entirety of the equity in the Fowler house in the marital estate. This assignment of error fails.

### 4. Valuation of Marital Home and Failure to Order Sale of Marital Home

Donavon's final assignment of error is that the district court erred in valuing the marital home at $345,000 instead of $375,000 and failing to order the sale of the marital home.

### (a) Valuation of Potter House

Donavon contends that the district court erred in its valuation of the marital home. The district court determined that the value of the Potter home was $345,000 based on the April 2021 appraisal. Donavon contends that the court should have valued the Potter house at $375,000 which, according to a real estate agent's testimony, was the price at which the Potter house could be sold in the housing market that existed at the time of the July 2021 trial. Donavon argues that the real estate agent's market analysis was more recent and complete than the April 2021 appraisal which valued the Potter house at $345,000. Donavon argues that the appraisal is "backward looking" in that the comparable sales went as far back as June 2020 and did not fully reflect the 7 percent increase in the housing market. He further argues that the court's utilization of the home's appraisal value, instead of the market analysis value, results in a disparity in the property division because it prevents him from participating in the increased value of the marital home while, at the same time, allowing Jessica to participate in the increase in value of his retirement account.

Here, the court had before it differing evidence regarding the value of the Potter house and resolved the dispute in favor of Jessica valuing the home at $345,000. After reviewing the record, we cannot say that the listing presentation provided by Donavon's expert provided better evidence of value than the more thorough valuation proffered by Jessica's expert. To the contrary, the valuation provided greater detail governing comparable properties and represented an opinion on value by a licensed appraiser whereas Donavon's expert explicitly refused to express an opinion on value. In short, based upon the evidence presented, we cannot say the court abused its discretion by adopting a fully endorsed opinion on value over the listing presentation offered by Donavon. Further, where credible evidence is in conflict on a material issue of fact, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Marcovitz v. Rogers*, 267 Neb. 456, 675 N.W.2d 132 (2004). We give weight to the fact that the district court heard and observed the witnesses regarding the value of the Potter house.

We further note that, as a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate and the date of valuation is reviewed for an abuse of the trial court's discretion. *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012). During Donavon's trial testimony, he requested that the court value the parties' marital estate as of October 2020. The court had before it values of the Potter house in April and July 2021. The court chose the value more closely related in time to an October 2020 date. Accordingly, we find that the district court did not abuse its discretion in valuing the Potter house at $345,000 based upon the April 2021 appraisal. This assignment of error fails.

(b) Court's Failure to Order Forced Sale of Potter House

Donavon's second argument related to the marital home is that the district court abused its discretion in refusing to order the sale of the marital home where there was substantial doubt in Jessica's ability to refinance the home and, even if she was able to do so, would leave Jessica financially strained. He asserts that even if Jessica was able to refinance the Potter house, her monthly payment would account for 50 percent of her total monthly budget and two-thirds of her monthly take home pay in addition to the $43,343.35 equalization payment that Jessica was ordered to pay to Donavon. He claims that the only fair and reasonable resolution was to order the sale of the home and divide the proceeds of the sale equally among the parties.

Recently, in *Bowen v. Bowen*, 29 Neb. App. 726, 737, 959 N.W.2d 282, 290 (2021), this court stated:

> "Nebraska courts do not generally order sales of marital assets to facilitate distribution. In the few cases where a sale is ordered, the sale was the only practical way to divide the parties' assets." *Kellner v. Kellner*, 8 Neb. App. 316, 328, 593 N.W.2d 1, 10 (1999). After discussing the few Nebraska cases in which marital property had been ordered sold, this court stated: "[A] court in a dissolution action may provide for the sale of all or part of the parties' assets in lieu of dividing them, if to do so is reasonable in the light of the facts, the circumstances of the parties, and the nature of their property. Such action, of course, must be within the statutory dictate that the division of the assets be reasonable, having regard for the circumstances of the parties as provided in § 42-365, and that it satisfy the ultimate test of fairness and reasonableness articulated by case law." *Kellner*, 8 Neb. App. at 332, 593 N.W.2d at 12.

Here, evidence was presented that Jessica could likely refinance the Potter house if she received either spousal support or retired her car loan. Further, Jessica testified that she desired to remain in the Potter house due to its proximity to the children's school and so the children would remain in the same school and near their friends. Based upon this evidence, a forced sale of the Potter house was not the only practical way to facilitate distribution as evidenced by the district court's final allocation of property. We find that the district court did not abuse its discretion in awarding the marital home to Jessica as opposed to ordering its sale. This assigned error fails.

## VI. CONCLUSION

Having considered and rejected Donavon's assignments of error, we affirm the district court's order in its entirety.

AFFIRMED.