IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PREUCIL V. PREUCIL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AMY L. PREUCIL, NOW KNOWN AS AMY L. HAYES, APPELLEE,

V.

DAVID L. PREUCIL, JR., APPELLANT.

Filed March 12, 2024.    No. A-23-030.

Appeal from the District Court for Douglas County: LEANNE M. SRB, Judge. Affirmed as modified.

John A. Kinney, of Kinney Mason, P.C., L.L.O., for appellant.

Mark W. Bubak for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

### INTRODUCTION

David L. Preucil, Jr., appeals the Douglas County District Court's decree dissolving his marriage to Amy L. Hayes Preucil, now known as Amy L. Hayes. David claims the district court erred by awarding alimony to Amy and by failing to set off his nonmarital contribution to one of the parties' properties. We find merit to David's argument that he is entitled to a nonmarital set off for a down payment made on the marital home purchased in 2009. We therefore affirm as modified.

### BACKGROUND

David and Amy married in September 2011. They had no children together, but both were previously divorced and there were children from prior relationships. Amy filed a complaint for dissolution of the marriage in August 2021 seeking an equitable division of the parties' property and debts. David filed an answer and counterclaim seeking the same, however, he also sought to

- 1 -

be awarded his separate premarital and nonmarital property. In her subsequent amended complaint, Amy also sought an award of alimony.

Trial was held on November 17, 2022. A signed "Stipulation and Agreement" was received into evidence. The signed agreement resolved the division of the parties' personal property, real estate, and financial accounts. A verbal stipulation regarding the values of specific accounts was also made on the record. As relevant to this appeal, issues to be resolved at trial were alimony and whether the down payment on the parties' Sprague Street home purchased in 2009 should be treated as David's nonmarital property. Both parties testified at trial, and numerous exhibits were received into evidence. The relevant evidence will be set forth as necessary in the analysis of the issues on appeal.

Pursuant to the district court's decree entered on December 13, 2022, and its order nunc pro tunc entered on December 16, the parties' marriage was dissolved, and their property and debts divided; David was to pay Amy a property equalization payment of $359,508.08. As relevant to this appeal, the court awarded Amy alimony in the amount of $5,000 per month for 24 months, but alimony was to terminate upon the death of either party or upon the remarriage of Amy. Additionally, the court found that David was not entitled to credit for any down payment he made towards the parties' joint purchase of their Sprague Street home.

David appeals.

## ASSIGNMENTS OF ERROR

David assigns, consolidated and restated, that the district court erred in (1) awarding alimony to Amy and (2) failing to set off $59,730 as his nonmarital contribution to the acquisition of the parties' Sprague Street home.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

### ALIMONY

David claims the district court abused its discretion when it awarded alimony to Amy.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.*

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Weidel v. Wiedel, supra*. The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.*

Amy, 53 years old, testified that she has been a mortgage loan officer since 2006. The parties were engaged in November 2008, bought a home together in June 2009, and were married in September 2011. She said that even before they were married, David's daughter lived with them full time, and Amy helped care for her. Amy's son also lived with them, but she said he had a father who participated in his life; however, when David was not around, there was no other parent or grandparent helping with his daughter. David traveled for work "quite a bit," and Amy was there to "handle things," whether it was his daughter, his dogs, or the household. Amy moved out of the parties' Sprague Street home in 2010 and did not move back into the home until 2014. "But even when I was not living physically in the Sprague Street home while we were married, I would go to the house . . . and do that or whatever." She took care of the Sprague Street home as well as her townhome and the parties' other properties. When asked if it was in support of David's efforts to retain and cultivate business relationships, Amy replied, "Absolutely."

Amy was "very supportive of [David's] traveling and time away from home to attend multiple events," "I mean, multiple nights a week he would be gone or having a happy hour here or having to meet somebody there or having an off meeting or a golf event or whatever." She was "pretty involved with [David's] work stuff," attending events with him and regularly hosting his coworkers and clients at their lake house, sometimes for the weekend. When asked if she was able to develop her business relations during the marriage, Amy responded, "I would attend some [networking] events," but "did not participate fully as if I had no other responsibilities going on." Amy said she "had a lot on [her] plate" taking care of multiple houses. She acknowledged that in her deposition she said she did not miss out on any career opportunities because of her marriage to David. At trial she clarified that she chose to make the family her priority. David testified that the parties mutually supported each other.

Amy stated that during the marriage, the parties bought a rental house and a lake house. They were also able to purchase boats, ATVs, four-wheelers, "all those types of things"; most were purchased with trade-ins and cash and were not financed. The parties were also able to regularly put money into investment accounts. They started traveling a lot more. Amy said that exhibit 34 was "a reflection of joint married standard of living" for the 12 months immediately preceding the parties' separation. The document, created by Amy, shows that from August 2020 through July 2021, the parties' combined spending was $398,351. She testified that she used her bank statement and David's bank statement and included all the money that was paid out of the accounts, "whether it was for pleasure, a vehicle purchase, a trip, [or] a fixed bill," "all the spending was in there"; "[t]he only thing I didn't include in that dollar amount would be any money that had

been transferred into savings or any money paid directly to North Western Mutual as an investment."

According to exhibits received into evidence, Amy's "wages, tips, other comp." was $76,681.13 in 2019 (an average of $6,390.09 per month); $181,762.66 in 2020 (an average of $15,146.89 per month); and $166,498 in 2021 (an average of $13,874.83 per month); she had earned $84,295.31 as of September 30, 2022 (an average of $9,366.15 per month). The foregoing amounts were gross earnings, not net earnings. She testified that "2020 and 2021 were off the charts for [her] industry for making money," but now her income "has dramatically dropped" because the "housing market is having a hard time right now," "[n]ot just the housing market, but interest rates have shot up" which has "slowed business dramatically." Exhibit 31, a document created by Amy, states that her average monthly expenses were $10,719.28.

According to exhibits received into evidence, David's "wages, tips, other comp." was $563,045.86 in 2019 (an average of $46,920.49 per month); $573,584.05 in 2020 (an average of $47,798.67 per month); and $666,701 in 2021 (an average of $55,558.42 per month); he had earned $652,651.04 as of October 8, 2022 (an average of $70,480.67 per month). The foregoing amounts were gross earnings, not net earnings. Exhibit 30, a document created by Amy, states that David's average monthly expenses were $10,719.29.

Amy requested alimony in the amount of $11,009 per month, stating that amount was "not equalizing" the parties' income. When asked how she arrived at that figure, Amy said that she "took the joint marital standard of living [$398,351] and divided it by two" to come up with an amount of $199,176 per person per year, then she subtracted her net income from that amount to come up with annual alimony of $132,104 per year, or $11,009 per month. Exhibit 34 was Amy's "Summary Statement Proposed Alimony." According to her exhibit, which was based on "Year-to-Date 2022" income, Amy's net monthly income after alimony would be $18,461, and after her monthly expenses of $10,719, she would have $7,742 in discretionary income. David's net monthly income after alimony would be $30,156, and after his monthly expenses of $10,718, he would have "$19,43[8]" in discretionary income .

Amy argues that "[d]isparity in incomes can partially justify an award of alimony and an alimony award can provide a means for the wife to partially recapture the standard of living she and her husband put together during the course of the marriage and assist her in maintaining the property awarded to her." Brief for appellee at 25. She states that during the marriage she and David "were able to establish a significant and noteworthy standard of living." Id. at 24. But after filing for divorce, the combination of increased expenses and a downturn in her income placed "significant financial strain upon her, and resulted in a significant decrease in the established marital standard of living and her ability to maintain the [Sprague Street home]." Id. at 25.

David claims that an award of alimony is not warranted in this case. He notes that the marriage was 10 years in duration but that the parties only lived together between 2014 and 2021, they had no children together, Amy worked full time and never gave up any career opportunities to support his job, her 3-year income average leading up to trial was $158,986, and she received more than $1 million dollars in property division including approximately $359,000 in cash. He argues "[t]here is not a single fact that legitimately supports the alimony award in this case other than [him] earning substantially more than Amy at the time of divorce." Brief for appellant at 9.

We can appreciate David's argument that factors that may weigh against alimony (e.g., Amy's career not being interrupted by the marriage, her "substantial earnings," *id*. at 8, and her receipt of a significant property settlement) could have supported the district court not awarding alimony. And had the court done so, we likely would have found no abuse of discretion. However, there is also evidence to support the court concluding otherwise. Amy's higher earnings took place during years when mortgage interest rates were low. When interest rates started increasing, the mortgage industry slowed down, and this is reflected in Amy's more recent reduced earnings. Further, when considering the parties' marital standard of living and that the alimony award is for only a 2-year period, we cannot say the district court abused its discretion in its award of alimony to Amy.

DAVID'S NONMARITAL DOWN PAYMENT

David claims that the district court erred by failing to set off $59,730 as his nonmarital contribution to the acquisition of the parties' Sprague Street home. On this issue, we agree with David.

Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* But if the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

A nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). A spouse's own testimony can establish a """"tracing link,"""" i.e., tracking an asset to a nonmarital source. *Id.* at 364, 934 N.W.2d at 495. See, also, *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Of course, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt, supra*. Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id.*

Amy testified that the parties were engaged in November 2008. At the time, they each owned their own home. Within a few months of becoming engaged, they began looking for a home to purchase together. They found a home on Sprague Street, signed a purchase agreement in May 2009, and closed on that home in June. The parties maintained separate finances both before and during their marriage, except for one joint bank account that the parties opened in July 2009, after they purchased their home. Both parties contributed an equal amount of funds to the joint account each month, and the mortgage payments, utilities, and other home expenses were paid from that account; David testified that they stopped using their joint account near the end of 2010. In addition to utilizing funds from their joint account, both parties also contributed their separate funds to the care and upkeep of the Sprague Street home prior to their September 2011 marriage.

Amy was asked about exhibit 45, David's "Real Estate Downpayment Tracing Documents" for the parties' Sprague Street home. The exhibit includes a "Settlement Statement"

from the U.S. Department of Housing and Urban Development related to the home purchase. The Settlement Statement names David and Amy as the borrowers, has a contract sales price of $298,650, shows settlement charges of $5,785.50, $85.59 in adjustments for items paid by seller in advance, $1,000 in earnest money, and $64,601.09 cash paid from the borrower. A copy of a $1,000 earnest money check David wrote is included in the exhibit. The exhibit also includes a "Ledger" purportedly subpoenaed from the title company. The ledger shows that $1,000 from David was posted on June 4, and deposited June 5. The ledger also shows a "Credit" of $64,601.09 from David posted June 24.

The following colloquy took place on the record:

Q [by counsel]. Okay. Now isn't it true [David] made the down payment on the marital residence in 2009 from his separate nonmarital funds?

A [by Amy]. Yes.

Q. You did not contribute any of your separate funds to the 20 percent down payment on the marital residence in 2009; correct?

A. That is correct.

. . . .

Q. . . . You want to carve out something different than $64,000, ma'am, and I'm asking for you to do it. . . . [J]ust tell us what you did to come up with the down payment.

A. I took the purchase price times 20 percent.

Q. Okay. And what was the purchase price?

A. I think it was 298,650. 298,650.

Q. 298,650 times .2 equals $59,730?

A. Correct.

Q. That's what [David] put down on the home?

A. Correct.

Q. And you don't want him to get any nonmarital credit for that; yes or no?

. . . .

A. No.

Amy also testified about exhibit 8, an email David sent to her on December 31, 2010. Amy stated that she had recently moved out of the Sprague Street home and she and David met for lunch. In his email afterwards, he wrote: "Let me know what you believe your share of the equity we've accumulated comes to and I'll pay you post haste." She testified that David never indicated he wanted a return of his down payment on the home. Amy requested that the district court deny David's request for consideration of any down payment he may have made on the Sprague Street home.

During his testimony, David confirmed he made the 20 percent down payment on the parties' Sprague Street home with nonmarital funds, and that the ledger reflected a $64,601.09 transfer with only his name listed. He also confirmed that he would be okay if his credit ended up being $59,730 instead of $64,601.09. David stated that the existing debt on the Sprague Street home had been refinanced more than once. When asked if there had been cash out refinancing where the parties pulled equity out and used it to pay for something else, David replied, "No." Then when asked if his original down payment had been "sitting in there the whole time," David

replied affirmatively. On cross-examination David was asked if he ever indicated to Amy that he wanted consideration or repayment of that down payment, and he replied, "No."

In its decree, the district court stated that David "is not entitled to a credit for any down payment he made towards the parties joint purchase of [the Sprague Street home]." The court gave no explanation for its ruling.

David argues that "Amy admitted that the down payment on the marital residence came from [his] separate income and was not the product of marital efforts," and therefore the "trial court should have reduced the marital estate by the amount of $59,730, which would have the effect of reducing the equalization payment by $29,865." Brief for appellant at 11.

Amy argues that the exhibits in evidence show that the $64,601.09 came from a cashier's check from both David and Amy, and that David "provided no documents or testimony as to where the additional $4,871.09" came from. Brief for appellee at 33. She further argues that the documents "show no tracing of $59,730 from the time of the joint purchase . . . in June 2009 to the time of trial in November 2022." *Id.*

Our review of the record from the Settlement Statement shows the following: $64,601.09 cash from borrower + $1,000 earnest money - $5,785.50 settlement charges - $85.59 adjustments paid by seller = $59,730 down payment. The $59,730 down payment equals 20 percent of the $298,650 purchase price. Regardless of where the "additional $4,871.09" came from--whether solely from David or the parties jointly--does not matter as Amy herself admitted at trial that the $59,730 down payment came from David's nonmarital funds. And David confirmed that although the parties refinanced the home more than once, there was no cash out refinancing.

Amy also argues that David "not only failed to prove the amount of equity in the home at the time of marriage, a fundamental requirement, but he failed to prove his relative and respective equitable interest in the family home at the time of marriage." Brief for appellee at 30. However, one of the cases cited by Amy did not involve a traceable down payment, instead the issue was whether a party met his burden to prove his claimed equity in the home at the time of marriage. The other case relied upon by Amy was not a marital dissolution case and was decided based on general principles of property law.

In the instant case, David seeks only to have his nonmarital down payment set off to him. Because that down payment was identified and traceable (including by Amy's own testimony), the district court abused its discretion by not setting off $59,730 as David's nonmarital property. Accordingly, as requested by David, we reduce Amy's equalization payment by $29,865.

## CONCLUSION

For the reasons stated above, we affirm the district court's award of alimony to Amy. However, we find that the district court abused its discretion when it failed to set off David's $59,730 down payment on the parties' Sprague Street home as his nonmarital property. Accordingly, we reduce Amy's equalization payment by $29,865, so that her equalization payment is modified to $329,643.08.

AFFIRMED AS MODIFIED.